No. 46,065

PATSY J. HECHT, *Appellant*, v. FIRST NATIONAL BANK & TRUST COMPANY of Salina, Kansas, Executor, [substituted for Phillip M. PLATTEN, M. D., (deceased)], and PHYLLIS E. RIPLEY, *Executrix*, [substituted for G. Sherman Ripley, M. D., (deceased)], *Appellees.*

(490 P. 2d 649)

Opinion filed November 6, 1971.

*Robert Martin,* of the firm of Martin, Porter, Pringle, Schell and Fair, of Wichita, argued the cause, and *William Oliver, Jr.,* of the same firm, and *John K. Bremyer,* of the firm of Lehmberg, Bremyer, Wise, Jones and Hopp, of McPherson, were with him on the brief for the appellant.

*C. Stanley Nelson,* of the firm of Hampton, Royce, Engleman and Nelson, of Salina, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

KAUL, J.: In this malpractice action plaintiff has sued to recover damages for injuries sustained by her which she claims resulted from defendants' negligence in administering x-ray treatments in a course of radiotherapy for Hodgkin's disease.

While the appeal was pending both defendants died. The First National Bank & Trust Company of Salina was duly appointed and qualified as administrator of the estate of Phillip M. Platten, M. D.,

deceased, and has been, by order of this court substituted as an appellee herein. Phyllis E. Ripley was duly appointed and qualified as executrix of the estate of G. Sherman Ripley, M. D., deceased, and has been, by order of this court, substituted as an appellee herein.

The question on appeal is when did the applicable statute of limitations commence to run?

Plaintiff filed her petition on March 13, 1968. Defendants filed an answer in the form of a general denial, and as an affirmative defense specifically pleaded that plaintiff's right of action as set forth in her petition did not accrue within two years next before the commencement of this action.

Depositions were taken of plaintiff, both defendants, and Dr. Terry E. Lilly, Jr., a Kansas City, Missouri, physician, who had been consulted by plaintiff.

Defendants filed a motion for summary judgment on the ground that plaintiff's action was barred by the two-year statute of limitations set forth in K. S. A. 60-513 (now 1970 Supp.).

Plaintiff filed a motion for partial summary judgment on the issue of the statute of limitations.

The trial court overruled plaintiff's motion and sustained defendants' motion. The trial court rested its conclusion on a finding to this effect:

"In this case the *fact of injury* not only became ascertainable to the plaintiff before March 13, 1966, but she also had full knowledge of the fact of the burn injury and its progression to ulceration before that time."

On appeal, plaintiff proposes two theories for reversal. First, she urges this court to adopt either the so-called "continuous treatment" rule, or the "physician-patient relationship" rule under either of which the statute of limitations is tolled with respect to a malpractice action while the defendant physician continues treatment for the injury involved. On this premise, plaintiff claims she is entitled to summary judgment on the limitations issue. Secondly, plaintiff claims the material facts as to whether her injury was substantial or reasonably ascertainable on March 13, 1966, are very much in dispute and cannot be determined as a matter of law. On this theory plaintiff asserts the trial court's summary judgment should be reversed and the issue of limitations be determined on trial.

In the spring of 1964 physicians at the Kansas University Medical

Center diagnosed plaintiff's condition as Hodgkin's disease and recommended radiation therapy in the area of her neck. She was referred to defendants who were physicians and radiologists practicing in Salina, which was near her home in Canton. Defendants accepted the pathological diagnosis of the Medical Center physicians and planned a course of treatment based thereon.

Plaintiff first reported to Dr. G. Sherman Ripley, one of the defendants, on May 22, 1964. Concerning this first contact, Dr. Ripley testified as follows:

"Then I prescribed the X-ray treatment and I explained to her that I thought she would go through them without any particular complications and that sometimes patients feel nauseated at the time of the treatment and that we would take care of that with medication, towards the end of the treatment her skin would be a little red and would later tan, and I tried to relieve her of any apprehension."

Plaintiff was given a course of twenty treatments with no significant after effects. She did contract a sore throat near the end of the treatment period.

In November of 1965 plaintiff noticed lumps in the groin area. After an examination by her family physician, the lumps were removed and sent in for laboratory examination. Plaintiff reported to the Kansas University Medical Center in January of 1966, where her condition was diagnosed as a reoccurrence of Hodgkin's disease in the left groin area. She was once again referred to defendants for x-ray therapy. Dr. Platten saw the plaintiff on January 28, 1966, at which time he concluded that plaintiff's condition was "Stage 3 Hodgkin's disease, disseminated," which he described in these words:

"Reoccurrence of Hodgkin's disease below the diaphragm in a patient previously having the disease primary above the diaphragm is' classified as a Stage 3 Hodgkin's disease case. These are not all incurable, but the prognosis for a cure is less than 50 percent."

Dr. Platten described his treatment plan in this manner:

"A. We wanted to deliver a maximum tumor dose to the entire right pelvis and whether she should tolerate 3,000 R in air through that original converging beam portal would have to be judged on the—her systemic reaction to the volume of tissue treated, and her skin reaction. In other words, that would define tolerance, what we could administer based on her general clinical condition and the skin.

"Q. Then you go on to say, 'It then may be possible to add a third straight AP port to give a total tumor dose calculated at midpelvis of 4,000 R.'

"A. Yes.

"Q. What is a straight AP port?

"A. I started out with two converging beams AP, meaning anterior-posterior, then using the time dose relationship, it is of critical importance in radiotherapy, having used these converging anterior fields, I would then treat a lateral area directed at the deep pelvic nodes and then a posterior area, that then would allow a long interval of time for the skin on the front of her pelvis to recover normally and possibly tolerate additional radiation if the other portals didn't permit delivery of this critical 4,000 R tumor dose."

A course of twenty treatments was planned. The first treatment was given on January 28, 1966. During this treatment, administered by Dr. Platten, plaintiff testified that she first felt a strange "crawling like" sensation and so informed Dr. Platten. Plaintiff received a second treatment on January 31, at which time Dr. Platten found that plaintiff had an abnormal skin reaction to the original treatment on the 28th and that there was more redness of the skin than he expected. Plaintiff complained of some pain in both of her ankles. Concerning plaintiff's condition on January 31, Dr. Platten testified as follows:

"A. Yes. There was pre-tibial edema, and I took her very, very seriously and I was extremely concerned that she had diseased nodes in both sides of her pelvis that were blocking the lymphatics or the veins draining her legs. I told her I had no explanation for it, I couldn't understand it, but that I was going to cut down the total dose and switch to a straight AP portal.

"Q. Did you tell her that you suspected that she had cancerous infection of the lymph nodes that was interfering with the drainage of her legs—you did not tell her that, did you?

"A. In my judgment on that date with her state of mind, it would have been wrong.

"Q. I assume by that answer you did not tell her.

"A. I did not tell her."

As indicated, the treatment was reduced on January 31. Plaintiff was given further reduced x-ray dosages on February 2, 4 and 7, at which point the radiation treatments were discontinued because of a skin reaction. Treatment was prescribed for the skin reaction and plaintiff continued to see defendants.

On March 2, 1966, she was examined by both defendants who noted the skin reaction was subsiding. Plaintiff was seen again by Dr. Platten on March 11, when he described her reaction as slowly healing.

At the suggestion of her mother and sister, plaintiff had made arrangements for consultation with Dr. Terry E. Lilly, Jr., of Kansas City, Missouri, on March 12, 1966. At this time, plaintiff described

the skin reaction condition as "the top was off the treatment area, it was open, raw and draining." Dr. Lilly discussed with plaintiff the difference between the results of the treatment to the neck and to the groin and told her that "she was a living example of successful and unsuccessful therapy." Dr. Lilly's consultation pertained primarily to a skin graft as a remedy. He testified that his impression was "that there had been a radiation reaction with breakdown." Dr. Lilly confirmed the opinion given by defendants after their examination of plaintiff on March 11, that the area was healing. Our scrutiny of Dr. Lilly's testimony reveals that he made no diagnosis or prognosis as to plaintiff's injury, nor did he advise her in so many words that it was the result of a radiation burn.

Defendants argue that plaintiff had ascertained that she had sustained a substantial or real burn injury shortly after the termination of treatments in February of 1966, and that, in any event, she either was or should have been made so aware by her consultation with Dr. Lilly on March 12, 1966, one day more than two years preceding the filing of her petition.

Subsequent to the commencement of the limitation period, plaintiff continued under the care of defendants. She was seen by Dr. Ripley on March 22, 27 and 29. With respect to these visits, Dr. Ripley testified that there was marked healing in the area of the reaction, that it was continuing to improve and would heal itself.

Dr. Platten continued to see plaintiff through the summer and fall of 1966, and testified that as late as October she showed improvement and that spontaneous healing could not be ruled out.

It appears that the first time defendants suspected any kind of permanent damage, stemming from the radiation treatments, was on July 22, 1966, when Dr. Ripley examined plaintiff and learned for the first time that she had some swelling and soreness in the left hip, which was lateral to the inguinal treatment area.

Dr. Ripley's testimony, concerning the July 22 examination, appears in part as follows:

"Q. And is that the first time you had any evidence in the way of symptoms to lead you to believe there had been damage to the deeper tissue or reaction in the deeper tissue than the merely the affliction of the skin that was apparent that you observed?

"A. This is the first time she showed any secondary signs of injury to the lymphatic or presence (sic) too of perhaps tumors which might cause this reaction.

"Q. The answer to the question is yes? This is the first time there was an indication of any interference with the skin, below the skin, a reaction to the tissue or damage?

"A. Well, in a radiation reaction we assume there is also damage below the skin areas as radiation is impossible to produce without damage to normal tissue. At any depth it will penetrate and could be demonstrated by the microscope, it is a matter of recovery.

"Q. I understand that is true, but it isn't normal nor is it inherent in the treatment that you have danger to the extent causes swelling and interference with fluid movement in that area?

"A. That is true.

"Q. Is that correct?

"A. Yes, sir.

"Q. All right, this is the first time that you had noticed danger to that extent whether theoretically there may be danger to the skin, danger to this extent, this is the first indication of it?

"A. If it was damaged, yes.

"Q. If it was damaged as distinguished from a tumor?

"A. Right.

"Q. Are you saying you don't know which one it is and you don't know actually to this day?

"A. No.

"Q. Would the fact she hasn't had a reoccurrence of the tumor and that probably radiation caused the damage, would this be a fair statement with this much time having passed?

"A. I don't know there is proof she didn't have a tumor in that area."

"Q. Is there any proof she does?

"A. No."

Plaintiff argues that Dr. Ripley's testimony clearly demonstrates that, even to the treating physicians, there was no indication prior to July 22 that the injury involved more than damage to superficial tissue, which would heal itself, and that the damage to underlying tissue and permanent damage to plaintiff's left leg was first indicated at this time.

It was not until December of 1966 that plaintiff was finally advised that the ulcer in the groin area, which resulted from the radiation treatment, was not going to heal of its own accord and would require surgical repair. Plastic surgery was performed on plaintiff, consisting of a series of five major and two minor operations. The first plastic surgery was performed in January 1967, and the last in January 1968.

The applicable statute of limitations is 60-513 (4), *supra*, which requires plaintiff's cause of action to recover damages to be filed within two years after her cause of action accrued. K. S. A. 60-513

was enacted in 1964 (amended in 1968, now K. S. A. 1970 Supp.), as a part of our new civil code of procedure. No change was made in the classification of actions subject to the two-year limitation period except that they were stated in separate numbered items. The significant change was the addition of a new provision specifying when a cause of action shall be deemed to have accrued. It reads:

"The cause of action in this section shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall the period be extended more than ten (10) years beyond the time of the act giving rise to the cause of action."

The new provision works an abrupt change in the previous law with respect to malpractice actions, which was established by consistent holdings of this court in *Graham v. Updegraph,* 144 Kan. 45, 58 P. 2d 475; *Becker v. Floersch,* 153 Kan. 374, 110 P. 2d 752; *Waddell v. Woods,* 160 Kan. 481, 163 P. 2d 348; and *Hill v. Hays,* 193 Kan. 453, 395 P. 2d 298. The rule was firmly established that the statute of limitations begins at the time the tort is committed. Even though the court seemed to recognize the harshness of the old rule in *Hill v. Hays,* supra, it was not altered—the court adhering to the philosophy that limitations are created by statute and are legislative, not judicial acts.

The court's reluctance to decree judicial legislation noted in *Hill* soon became of no moment as a result of the legislature's action in adding the provision interpreting the term "accrued" when the applicable statute of limitations was reenacted in the form of 60-513, *supra.*

Under the new provision the period of limitation does not commence until the act giving rise to the cause of action first causes substantial injury, or in the alternative, if the fact of injury is not reasonably ascertainable until some time after the initial act, then not until the fact of injury becomes reasonably ascertainable to the injured party.

We turn now to the application of the statute to the facts in the case at bar. We are of the opinion the evidence was not sufficiently conclusive on either of the two statutory conditions for the trial court to resolve, as a matter of law, the issue raised by the statute

of limitations. The testimony of none of the parties deposed shows conclusively that the negligent acts alleged had caused substantial injury on March 13, 1966. It is true that plaintiff knew she had an unhealed sore on March 12, when she saw Dr. Lilly, but both Dr. Lilly and Dr. Ripley, who had seen plaintiff the previous day, described the condition then as slowly healing and that the conservative treatment which plaintiff was then undergoing would likely result in a complete healing.

Later, on March 22, Dr. Ripley found a marked healing in the area of reaction. In connection with his examination of March 22, Dr. Ripley's testimony reveals the difficulty in measuring, with any degree of medical certainty, plaintiff's condition in terms of "substantial injury" with respect to radiation reaction. He testified that normally there would be an observable reaction on most cases of the type of radiation used in cancer therapy.

With respect to reaction to radiation therapy, Dr. Ripley testified:

"Q. (By Mr. Martin) Let's get at it this way. Normally, you would find reaction in some sort or another to radiation therapy?

"A. In varying degrees, yes, sir.

"Q. In varying degrees, but usually you get some sort of reaction? It may be sore throat or reddening of the neck as she got on the first treatment, or it might be reddening or bronzing of an area like which occurred in her groin?

"A. Some types of radiation, there are different qualities of radiation and quantities. There would be an observable reaction on most cases of the type of radiation we are talking about, or cancer, there is reaction.

"Q. Then you say in most types of radiation therapy for cancer you do observe some sort of reaction.

"A. Yes, sir.

"Q. And the degree of that reaction may vary in a good number of circumstances, dosage of the treatment, age, condition of the patient, condition of the area you are trying to treat, and the location, the inner location of cancer cells you are trying to reach, is that a fair statement?

"A. Yes, sir.

"Q. And so that they, the appearance of a reaction is not necessarily alarming to you as a physician nor should be alarming to a patient that is being treated for cancer because you expect some reaction, is that right, sir?

"A. The first part is correct, it wouldn't be alarming to me, it might be alarming to some patient unless they have been told a brief reaction might occur.

"Q. All right, when you get a reaction on the part of the patient that is being treated for cancer, is this something you expect?

"A. Yes, sir.

"Q. Then, as long as that reaction is within normal bounds, that it takes a course which doesn't indicate that it is going to be permanent or something like that, is it correct you normally explain to these people they are going to get a reaction to this type of treatment because that is what you expect?
"A. Yes."

We believe a fair analysis of the testimony of the three physicians deposed clearly indicates that as of March 13, 1966, none of them had made a diagnosis or prognosis of plaintiff's condition in terms of substantial injury since it was too early to do so with reference to the time of the treatments and the healing condition of plaintiff at the time. We do not believe that plaintiff's knowledge of her condition from her own observation, and that acquired from her physicians, is sufficient to justify a determination, as a matter of law, that she knew or could have reasonably ascertained on March 13, 1966, that she had suffered substantial injury caused by the alleged negligent treatment of defendants.

Plaintiff alleges in her petition that she did not know that she had been injured and the fact of her injury was not reasonably ascertainable to her until surgery was prescribed in January of 1967. Since the evidence presented, as we see it, is inconclusive as to what point in time plaintiff's injury could be said to be substantial or reasonably ascertainable, we conclude that plaintiff should be afforded an opportunity to prove that she neither knew nor could reasonably have been expected to know of defendants' alleged negligence until the date alleged in her petition. A summary judgment based on the premise that plaintiff on March 13, 1966, knew or could have reasonably ascertained that she had suffered substantial injury resulted from alleged acts of negligence by defendants necessitated a finding of fact which was, we believe, in good faith disputed.

*Miller v. Beech Aircraft Corporation,* 204 Kan. 184, 460 P. 2d 535, was an action brought by a workman against his employer for personal injuries arising out of a disease allegedly resulting from the conditions of his employment. In reversing a directed verdict on the issue of the statute of limitations, we said:

"Without getting into specifics, we incline to the belief it was for the jury to determine in this case when plaintiff's disabling disease and its cause became manifest or when, in the exercise of due care, the same was reasonably ascertainable. . . . We are of the opinion that the evidence as to what if any medical advice plaintiff received, and whether he was or should have been aware of the actual state of his health and the connection between his employment and the pulmonary fibrosis ravaging his lungs, was not sufficiently con-

clusive for the trial court to resolve, as a matter of law, the issue raised by the statute of limitations." (pp. 189-190.)

In *George v. W-G Fertilizer, Inc.*, 205 Kan. 360, 469 P. 2d 459, which involved the application of K. S. A. 60-513 (2), we said:

". . . The evidence was in dispute as to when the 'fact of injury' first became reasonably ascertainable to plaintiffs and, thus, was an issue for determination by the trier of fact. . . ." (p. 366.)

Summary judgment may be proper on the affirmative defense of the statute of limitations where there is no dispute or genuine issue as to the time when the statute commenced to run. (*City of Ulysses v. Neidert*, 196 Kan. 169, 409 P. 2d 800; and *Hartman v. Stumbo*, 195 Kan. 634, 408 P. 2d 693.) But where the evidence is in dispute as to when substantial injury first appears or when it becomes reasonably ascertainable, the issue is for determination by the trier of fact.

What has been said effectively disposes of this appeal. However, since plaintiff has devoted a considerable portion of her brief in support of her claim for partial summary judgment on the limitations issue, we shall give her arguments brief consideration.

Plaintiff strenuously urges that the time when a cause of action in malpractice shall be deemed to have accrued should be extended through the period of time that the "physician-patient relationship" continues or while the physician continues to treat the patient for the injury which resulted from the negligent act. The two proposals of plaintiff are commonly designated as the "physician-patient relationship" and the "continuous treatment" doctrines both of which have considerable support. (See 80 A. L. R. 2d, Anno., p. 368, and cases cited therein, and A. L. R. 2d Later Case Service, 1971 Supplement, 80 A. L. R. 2d pp. 30-33 incl.; and Cornell Law Quarterly, Vol. 47, No. 3, p. 339.) An example of the application of the "physician-patient relationship" doctrine may be found in *Hundley v. St. Francis Hospital*, 161 Cal. App. 2d 800, 327 P. 2d 131; 80 A. L. R. 2d 360, and the "continuous treatment" doctrine in *Borgia v. City of New York*, 12 N. Y. 2d 151, 237 N. Y. S. 2d 319.

An examination of the cases in which either of the two doctrines was adopted reveals that generally the treatment was a judicial effort to soften the harshness of the statutory accrual rule existing in the particular jurisdiction at the time. The Kansas legislature preempted policy making on the subject by enacting in 1963 the additional provision of 60-513 and has given the matter further consid-

eration by enacting in 1970 additional provisions relating to injuries resulting from ionizing radiation. (See K. S. A. 1970 Supp. 60-513a, 60-513b and 60-513c.) The legislature did not see fit to mention either "physician-patient relationship" or "continuous treatment" as an element in measuring the time in which a cause of action accrues. We are not inclined to do so by judicially legislating. This is not to say that evidence stemming from "physician-patient relationship" or "continuous treatment," when relevant, would not bear upon the issue as to when substantial injury becomes reasonably ascertainable.

The Kansas provision has an outside limitation of ten years, but otherwise is essentially what has been identified as the "discovery rule." In judicially adopting the "discovery rule" in *Johnson v. Caldwell*, 371 Mich. 368, 123 N. W. 2d 785, the Michigan Supreme Court observed that since 1949 the trend has been toward the "discovery rule," which the court defined in these terms:

". . . Simply and clearly stated the discovery rule is: The limitation statute or statutes in malpractice cases do not start to run until the date of discovery, or the date when, by the exercise of reasonable care, plaintiff should have discovered the wrongful act. . . ." (p. 379.)

We conclude the trial court properly overruled plaintiff's motion for summary judgment but erred in sustaining defendants' motion.

The judgment is reversed and the case remanded to the trial court for further proceedings.