No. 66,529

Ruby Jones, *Appellant*, v. Neuroscience Associates, Inc., P.A., Robert M. Beatty, M.D., Anesthesiology Chartered, and Steven G. Cohn, M.D., *Appellees*.

(827 P.2d 51)

Opinion filed February 28, 1992.

*Rosie M. Quinn*, of Rosie M. Quinn & Associates, of Kansas City, argued the cause and was on the brief for appellant.

*James D. Griffin*, of Blackwell Sanders Matheny Weary & Lombardi, of Overland Park, argued the cause, and *Michael G. Smith*, of the same firm, and *Larry L. McMullen*, of the same firm, of Kansas City, Missouri, were with him on the brief for appellee Robert M. Beatty, M.D.

*Katherine C. Opie*, of Couch, Strausbaugh, Pierce & King, Chartered, of Overland Park, argued the cause, and *Hal Pierce*, of the same firm, was with her on the brief for appellee Anesthesiology Chartered.

*Thomas M. Sutherland*, of Holbrook, Heaven & Fay, P.A., of Merriam, argued the cause, and *Janet M. Simpson*, of the same firm, was with him on the brief for appellee Steven G. Cohn, M.D.

The opinion of the court was delivered by

LOCKETT, J.: This is a medical malpractice action. Ruby Jones was injured in an automobile accident in November 1985. She underwent a cervical laminectomy on January 17, 1986. During this surgery, the radial nerve in her left arm was damaged. Jones filed this lawsuit on January 16, 1990, more than two years after the surgery. The trial court granted the defendants' motions for summary judgment, finding (1) the action was barred by the K.S.A. 60-513(a) two-year limitation for bringing the action, and (2) Anesthesiology Chartered could not be vicariously liable for the acts of its agents under K.S.A. 40-3403(h). Plaintiff appealed, claiming (1) her action was filed within the period of limitations; (2) the statute of limitations was tolled because of the continuous treatment or blameless ignorance doctrines, fraudulent concealment, or equitable estoppel; (3) she had a separate cause of action against Dr. Robert Beatty that did not relate to the initial surgery; (4) the trial court erred by granting summary judgment on the statute of limitations issue because genuine issues of fact existed; and (5) the trial court erred by granting Anesthesiology Chartered summary judgment.

Ruby Jones sustained injuries to her neck or back in the accident. One of the symptoms of the injury was pain in her right arm. Her physician, Dr. A.P. Taliaferro, referred Jones to Dr. Robert Beatty for treatment of the injuries.

Dr. Beatty hospitalized Jones in January 1986, and performed a cervical laminectomy. The anesthesiologist was Dr. Steven G. Cohn, an employee of Anesthesiology Chartered. The day after the surgery, Jones could not move her left hand and all the fingers on her left hand were curled into a fist. Jones now estimates she has lost 90% of the use of her left hand.

Jones' deposition indicates that on January 18, Dr. Beatty informed Jones that there had been a problem and they were going to continue to observe the situation. Dr. Beatty told Jones that her condition would be resolved in 2 months. He later informed Jones it would be resolved in 6 months; then 9 months; then 18 months; and finally 2-4 years. During 1987, Jones' condition did improve such that three fingers on her left hand had uncurled.

Jones' deposition also indicates that the day after her surgery Dr. Cohn visited Jones in her hospital room. Dr. Cohn told Jones there had been a little problem during the surgery. When asked by Jones what the problem was, Dr. Cohn did not go into any detail but told Jones she was with the right people and the problem would clear up. Jones saw Dr. Cohn two or three times after January 18, 1986. She last talked to Dr. Cohn sometime in 1986, during outpatient physical therapy treatment. Dr. Cohn did not inform Jones her injuries were permanent.

In a deposition, Dr. Beatty indicated Jones' problem with her left hand and arm was possibly related to the anesthesiologist, Dr. Cohn, positioning the patient during surgery. Dr. Beatty stated that Jones was positioned normally but it was his opinion that a metal strut which held the patient in a sitting position had rested against Jones' arm, creating pressure against the radial nerve. Dr. Beatty testified that although care was taken, there was sufficient pressure to cause Jones' injury. Dr. Beatty said he had diagnosed plaintiff's problem with her left hand and arm as a compressive radial nerve neuropathy which usually improves and it was improving in plaintiff's case.

Jones last saw Dr. Beatty in 1987 or 1988. In December 1989, Jones discovered the medical records at Providence-St. Margaret Health Center indicate that Dr. Beatty positioned her during the January 17, 1986, surgery, not Dr. Cohn.

After her surgery, Jones contacted two other doctors, Dr. Taliaferro and Dr. Ragland, about her condition. Both doctors informed her that if she was having any problem or had questions she should consult the doctor who was treating her, Dr. Beatty.

In April or May of 1990, Jones consulted doctors at the Neurology Department at the University of Kansas Medical Center. She was advised by the doctors that the radial nerve in her left arm had been damaged. Jones was informed that immediately after surgery Dr. Beatty should have had an EMG performed on her left arm. Jones was told because of Dr. Beatty's delay, no further improvement of her left hand was now possible. Jones claims she first became aware the condition of her left hand was permanent when she was informed by the doctors at the University of Kansas Medical Center in 1990.

Jones filed her action on January 16, 1990, four years after the surgery. All defendants filed motions for summary judgment, contending Jones' action was barred by the two-year limitation of K.S.A. 60-513. Anesthesiology Chartered further contended it should be dismissed as a defendant because it could not be held vicariously liable for its employee's, Dr. Cohn's, negligence under K.S.A. 40-3403(h).

The district judge noted that (1) Jones was aware her arm or hand was injured after the surgery on January 17, 1986, or on June 10, 1987, when Dr. Beatty stated in his deposition that Jones had suffered injury and damage during the surgery; (2) in addition to having knowledge of her injury, Jones admitted that two of her friends, who had medical experience, told her that the result of the operation was unusual and unexpected in such a surgical procedure; and (3) despite this knowledge, Jones did not institute this suit until January 16, 1990, well beyond the two-year limitation. The district judge granted all the defendants' motions for summary judgment, finding (1) the two-year statute of limitations had run and (2) Anesthesiology Chartered could not be held vicariously liable for Dr. Cohn's acts. Plaintiff raises several issues.

Jones contends there was no evidence before the trial court that either Anesthesiology Chartered or Dr. Cohn had a policy of professional liability insurance such that Anesthesiology Chartered would fall under the no vicarious liability umbrella of K.S.A. 40-3403(h). Jones further contends the doctrine of respondeat superior was not changed by the Kansas Health Care Provider Insurance Availability Act, K.S.A. 40-3401 *et seq.*

K.S.A. 40-3403(h) provides:

"(h) A health care provider who is qualified for coverage under the fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund. The provisions of this subsection shall apply to all claims filed on or after the effective date of this act."

Anesthesiology Chartered's motion for summary judgment stated it was a health care provider who is qualified for coverage under the fund.

The district court correctly concluded K.S.A. 40-3403(h) abolished vicarious liability for health care providers in 1986 and that Anesthesiology Chartered should be granted summary judgment. See *Sharples v. Roberts*, 249 Kan. 286, 816 P.2d 390 (1991), for a discussion of 40-3403(h).

Was Jones' action filed within two years after the injury to her left arm or hand was reasonably ascertainable, *i.e.*, within the two-year period of limitations for filing a medical malpractice action? In considering a motion for summary judgment, a trial court must give to a litigant against whom summary judgment is sought the benefit of all inferences that may be drawn from the admitted facts under consideration.

K.S.A. 60-513(a)(7) and (c) provide:

"(a) The following actions shall be brought within two (2) years:

. . . .

"(7) An action arising out of the rendering of or failure to render professional services by a health care provider, not arising on contract.

. . . .

"(c) A cause of action arising out of the rendering of or the failure to render professional services by a health care provider shall be deemed to have accrued at the time of the occurrence of the act giving rise to the cause of action, unless the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall such an action be commenced more than four (4) years beyond the time of the act giving rise to the cause of action."

Jones' petition was filed on January 16, 1990, more than two years after the January 17, 1986, laminectomy.

Jones nevertheless asserts her action was commenced within two years after she ascertained the extent of her injury. In essence, her contention is that, although she knew her arm had been injured during the surgery, the K.S.A. 60-513(a)(7) limitation did not commence to run on her cause of action until she was informed by doctors at the University of Kansas Medical Center that her injury was substantial and permanent and that, therefore, the action was filed within the two-year limitation of K.S.A. 60-513(a). The defendants argue the statute of limitations is triggered by knowledge of the fact of injury, not the extent of injury. They cite *Brueck v. Krings*, 230 Kan. 466, 470-71, 638 P.2d 904 (1982), as authority.

In *Brueck,* over 12,000 depositors were affected by the collapse of Kansas Savings and Loan Association (Kansas Savings) and the lack of any state or federal insurance guarantee of depositors' accounts. Four plaintiff depositors filed a class action against multiple defendants, seeking $72,000,000 in actual damages, $150,000,000 in punitive damages, and reasonable attorney fees. More than two years after the action was filed, plaintiffs' attempt to add Peat, Marwick, Mitchell & Company (Peat, Marwick) as an additional defendant in an amended petition was denied. Plaintiffs appealed. See *Brueck v. Krings,* 6 Kan. App. 2d 622, 623, 631 P.2d 1233 (1981).

Kansas Savings first employed Peat, Marwick to perform an audit of Kansas Savings' books for the fiscal year ending June 30, 1971. That engagement was the result of a letter dated May 11, 1971, written by one of the Peat, Marwick partners to Kansas Savings, spelling out the details of the proposed audit; the proposal was accepted in writing by Kansas Savings. Two subsequent audits were performed under oral agreements for the fiscal years 1972 and 1973; the 1973 audit report was delivered on March 1, 1974. Peat, Marwick commenced work on an audit for the year 1974, but encountered various problems. Peat, Marwick wrote to the State Savings and Loan Commissioner on May 5, 1975, advising him that in the process of conducting the 1974 audit, it found that the delinquency status of Kansas Savings' loan portfolio had deteriorated and that the "magnitude of the . . . loan delinquencies indicates that the operations and financial condition of the Association could be seriously impaired." By letter of September 4, 1975, Peat, Marwick advised the Commissioner that it had been terminated on August 14, 1975, as the auditor for Kansas Savings, and that the Commissioner would not receive the 1974 audit report from Peat, Marwick. *Brueck v. Krings,* 230 Kan. at 468.

On January 31, 1977, Kansas Savings was placed under a trustee and it was closed on August 1, 1977. The action by Bernard J. Brueck and other depositors in Kansas Savings was commenced on August 2, 1977; Peat, Marwick, however, was not designated as a defendant at that time. Peat, Marwick was not made a defendant until plaintiffs filed an amended petition on February 16, 1979. 230 Kan. at 468-70.

All the plaintiffs' claims against Peat, Marwick were tort claims; therefore, the two-year statute of limitations applied. The trial court found that the fact of injury was reasonably ascertainable more than two years before the plaintiffs' amended petition adding Peat, Marwick as an additional defendant was filed. We stated the crucial information to trigger the running of the statute of limitations is knowledge of the fact of injury, not the extent of injury (citing *Friends University v. W.R. Grace & Co.*, 227 Kan. 559, 608 P.2d 936 [1980]). We found the record demonstrated the plaintiff reasonably could have ascertained the fact of their injury caused by Peat, Marwick considerably more than two years before they attempted to add the firm as an additional defendant. *Brueck v. Krings*, 230 Kan. at 470-71. It is important to note in *Brueck* the plaintiffs knew not only the fact of their injury, but were aware of the extent of the injury when they originally filed their petition.

Jones asserts summary judgment was improper because there was disputed evidence as to when substantial injury first appeared or when it became reasonably ascertainable; therefore, the issue of when the statute commenced to run was for the trier of fact to determine. As authority, she cites *Cleveland v. Wong*, 237 Kan. 410, 701 P.2d 1301 (1985) and *Hecht v. First National Bank & Trust Co.*, 208 Kan. 84, 490 P.2d 649 (1971).

In *Hecht*, a malpractice action filed more than two years after the injury, Hecht sued to recover damages for injuries she alleged resulted from the defendant doctors' negligence in administering x-ray and radiation therapy treatments for Hodgkin's disease.

In the spring of 1964 physicians at the Kansas University Medical Center diagnosed Hecht's condition as Hodgkin's disease and recommended radiation therapy in the area of her neck. She was referred to defendants, who were physicians and radiologists. Defendants accepted the pathological diagnosis, and Hecht was given 20 treatments with no significant aftereffects. 208 Kan. at 85-86.

In November of 1965 Hecht noticed lumps in her groin area. After an examination by her family physician, the lumps were removed and sent in for laboratory examination. Hecht was advised by the Kansas University Medical Center in January of 1966 that she had a recurrence of Hodgkin's disease in the left groin

area. She was ónce again referred to defendants for x-ray therapy. Dr. Platten saw the plaintiff on January 28, 1966, at which time he concluded that plaintiff's condition was "Stage 3 Hodgkin's disease." 208 Kan. at 86.

A second course of 20 treatments was planned. The first treatment was given on January 28, 1966. Hecht testified that she first felt a strange "crawling like" sensation and so informed Dr. Platten. During the second treatment on January 31, Dr. Platten found that Hecht had an abnormal skin reaction to the original treatment on the 28th and that there was more redness of the skin than he expected. Hecht complained of some pain in both of her ankles. After Hecht was given further reduced x-ray dosages on February 2, 4, and 7, the radiation treatments were discontinued because of a skin reaction. Treatment was prescribed for the skin reaction. Hecht continued to see defendants. On March 2, 1966, she was examined by both defendants who noted the skin reaction was subsiding. Hecht was seen again by Dr. Platten on March 11, when he described her reaction as slowly healing. 208 Kan. at 87.

At the suggestion of her mother and sister, Hecht arranged for consultation with Dr. Terry E. Lilly, Jr. Dr. Lilly testified that his impression was "that there had been a radiation reaction with breakdown." Dr. Lilly confirmed the opinion given by defendants, after their examination of Hecht on March 11, that the area was healing. Dr. Lilly made no diagnosis or prognosis as to Hecht's injury, nor did he advise her that the injury was the result of a radiation burn. 208 Kan. at 87-88.

The first time defendants suspected any kind of permanent damage stemming from the radiation treatments was on July 22, 1966, when Dr. Ripley examined plaintiff and observed that she had some swelling and soreness in the left hip, which was lateral to the inguinal treatment area. 208 Kan. at 88. It was not until December of 1966 that Hecht was finally advised that the ulcer in the groin area, which resulted from the radiation treatment, was not going to heal of its own accord and would require surgical repair. Plastic surgery was performed on Hecht, consisting of a series of five major and two minor operations. The first plastic surgery was performed in January 1967, and the last in January

1968. 208 Kan. at 89. Hecht filed her petition on March 13, 1968.

Defendants moved for summary judgment, alleging plaintiff's action was barred by the two-year statute of limitations, K.S.A. 60-513 (Corrick). The trial court granted defendants' motion, concluding the fact of injury became ascertainable to the plaintiff when she had knowledge of the fact of the burn injury and was aware of its progression to ulceration before March 13, 1966.

On appeal, the *Hecht* court noted the applicable statute of limitations was 60-513(4), which required plaintiff's cause of action to recover damages to be filed within two years after her cause of action accrued. K.S.A. 60-513 (Corrick) was enacted in 1963 and became effective in 1964. It read in part:

"The cause of action in this section shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall the period be extended more than ten (10) years beyond the time of the act giving rise to the cause of action."

The court observed the new provision of the statute was an abrupt change in the previous law with respect to malpractice actions, established by this court in *Hill v. Hays*, 193 Kan. 453, 395 P.2d 298 (1964); *Waddell v. Woods*, 160 Kan. 481, 163 P.2d 348 (1948); *Becker v. Floersch*, 153 Kan. 374, 110 P.2d 752 (1941); and *Graham v. Updegraph*, 144 Kan. 45, 58 P.2d 475 (1936), that the statute of limitations begins at the time the tort is committed. The *Hecht* court noted that even though the harshness of the old rule was recogized in *Hill v. Hays*, the *Hill* court adhered to the philosophy that limitations are created by statute and are legislative, not judicial, acts. The Supreme Court's reluctance to decree judicial legislation noted in *Hill* resulted in the legislature's action in adding the provision interpreting the term "accrued" when that statute of limitations was reenacted in the form of K.S.A. 60-513 (Corrick). Under the new provision, the period of limitation did not commence until (1) the act giving rise to the cause of action first causes substantial injury or (2) if the fact of injury is not reasonably ascertainable until some time

after the initial act, then not until the fact of injury becomes reasonably ascertainable to the injured party. 208 Kan. at 90.

In her appeal, Hecht proposed two theories for reversal of the trial court's grant of summary judgment. First, Hecht asked this court to adopt either the so-called "continuous treatment" doctrine or the "physician-patient relationship" doctrine. Under either doctrine, the statute of limitations for a malpractice action is tolled while the defendant physician continues treatment for the injury involved. Second, Hecht claimed the material facts as to whether her injury was substantial or reasonably ascertainable on March 13, 1966, were in dispute and could not be determined as a matter of law. 208 Kan. at 92-93.

The *Hecht* court observed that the "physician-patient relationship" and the "continuous treatment" doctrines both have considerable support. An examination of the cases in which either of the two doctrines was adopted revealed a judicial effort to soften the harshness of the statutory accrual rule existing in the particular jurisdiction at the time. The court noted the Kansas Legislature preempted policy-making on the subject by enacting in 1963 the additional provision in 60-513 and had given the matter further consideration by enacting in 1970 additional provisions relating to injuries resulting from ionizing radiation. The legislature had not mentioned either the "physician-patient relationship" or "continuous treatment" doctrines as an element in measuring the time in which a cause of action accrues. The court stated it was not inclined to do so by judicially legislating but asserted this was not to say that evidence stemming from the "physician-patient relationship" or "continuous treatment" doctrines when relevant, would not bear upon the issue as to when substantial injury becomes reasonably ascertainable. 208 Kan. at 93-94.

The *Hecht* court then observed summary judgment may be proper on the affirmative defense of the statute of limitations where there is no dispute or genuine issue as to the time when the statute commenced to run. But where the evidence is in dispute as to when substantial injury first appears or when it becomes reasonably ascertainable, the issue is for determination by the trier of fact. 208 Kan. at 93.

The court noted Hecht alleged in her petition that she did not know that she had been injured and the fact of her injury was not reasonably ascertainable to her until surgery was prescribed in January of 1967. Since the evidence presented was inconclusive as to what point in time plaintiff's injury could be said to be substantial or reasonably ascertainable, the *Hecht* court concluded that plaintiff should be afforded an opportunity to prove that she neither knew nor could reasonably have been expected to know of defendants' alleged negligence until the date alleged in her petition. A summary judgment based on the premise that plaintiff on March 13, 1966, knew or could have reasonably ascertained that she had suffered substantial injury resulted from alleged acts of negligence by defendants necessitated a finding of fact which was disputed in good faith. 208 Kan. at 92.

In *Cleveland v. Wong*, 237 Kan. 410, one of the issues on appeal was whether plaintiff Cleveland's claims were barred by the statute of limitations. Cleveland was admitted to a hospital for treatment of a possible urinary tract infection on May 1, 1978. Dr. Wong examined him on May 2. Rather than combat Cleveland's urinary infection with effective antibiotics, Dr. Wong recommended that Cleveland undergo a surgical procedure known as a transurethral resection prostate (TUR). After both Dr. Duffy and Dr. Wong advised Cleveland that temporary urinary incontinence and sexual impotence were usual after such an operation, he signed an authorization for surgical treatment which stated that the TUR operation carries with it a risk of post-operative urinary incontinence and sexual impotence. Dr. Wong performed prostate surgery on May 19. 237 Kan. at 411.

Dr. Wong continued to treat plaintiff. Because Cleveland experienced incontinence and impotence, on October 24, 1978, Dr. Wong performed a second TUR operation. Cleveland understood that the purpose of this second surgical procedure was to correct his incontinence; Dr. Wong, however, wrote in his notes that the purpose was to perform a biopsy to rule out the possibility of cancer. The tissue removed was noncancerous. This second surgery did not correct Cleveland's incontinence. 237 Kan. at 412.

Finally, in the fall of 1979, Cleveland consulted Dr. Bass of the Wichita Urology Group. Dr. Bass, a urological surgeon, con-

ducted extensive examinations of Cleveland and concluded that his incontinence was a direct result of his prior prostatic surgery. Dr. Bass found an obvious defect in the sphincter muscle, and tests disclosed that the muscle could no longer exert sufficient pressure to cause the normal retention of urine. As this defect could not be corrected surgically, Cleveland's incontinence was permanent. Cleveland claimed that his incontinence and his impotency were needlessly caused by the negligence of the defendant. 237 Kan. at 412.

In *Cleveland*, the first issue was whether plaintiff's action for medical malpractice was barred by K.S.A. 60-513(a)(7). The *Cleveland* court noted our prior holding in *Hecht v. First National Bank & Trust Co.*, 208 Kan. 84, that under the provisions of 60-513 a cause of action in malpractice does not accrue until such time as substantial injury results from the alleged acts of malpractice or until the fact of injury becomes reasonably ascertainable. Here, the initial surgery was performed by Dr. Wong on May 19, 1978. Dr. Bass' opinion was received on September 22, 1979. This action was commenced on August 14, 1980. The issue, then, was whether the fact of injury became reasonably ascertainable to the plaintiff immediately following the initial surgery. 237 Kan. at 413-14.

Dr. Wong contended that as Cleveland was both incontinent and impotent immediately following the initial surgery, the fact of injury was reasonably ascertainable to him. The *Cleveland* court observed that this contention overlooked the evidence that Dr. Wong, as well as Cleveland's personal physician, advised Cleveland that temporary incontinence and impotence were normal immediately following TUR surgery. Thus, while Cleveland knew that he was both incontinent and impotent immediately after the surgery, he had no reason to suspect that those conditions were permanent or that those conditions were the result of any negligence or malpractice on the part of Dr. Wong. The evidence and the positions of the parties presented an issue of fact and the trial court had properly submitted this issue to the jury. 237 Kan. at 414.

In *Cleveland*, as in *Hecht*, we again refused to adopt the "physician-patient relationship" or "continuous treatment" doctrines as an element in measuring the time in which a cause of action

occurs. Here, however, Jones' reliance on *Hecht v. First National Bank & Trust Co.*, 208 Kan. 84, and *Cleveland v. Wong*, 237 Kan. 410, is persuasive. Under K.S.A. 60-513(c), a cause of action in medical malpractice does not accrue until such time as substantial injury results from the alleged act of malpractice or until the fact of injury becomes reasonably ascertainable. Where there is conflicting evidence as to when a cause of action for medical malpractice is deemed to have accrued under K.S.A. 60-513(c), the matter becomes an issue for determination by the trier of fact.

Under the facts of this case evidence stemming from the "physician-patient relationship" or "continuous treatment" doctrines is relevant upon the issue of when it was reasonably apparent to Jones that her injury was permanent, *i.e.*, substantial. Since the evidence is inconclusive, Jones must be afforded the right to have that issue determined by the trier of fact. If we were to decide otherwise, patients having surgery and then suffering an unexpected result would be required to immediately determine if the unexpected result was a substantial injury resulting from malpractice. This would be an uncalled-for result, seriously impairing the physician-patient relationship.

Affirmed in part, reversed in part, and remanded for further proceedings.