**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 18, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

FREDERICK BERNDT,

     Plaintiff - Appellant,

and

EMPLOYERS MUTUAL
INSURANCE COMPANIES;
STANTON COUNTY;

     Plaintiffs - Intervenors,

v.

GARY KRAMER, M.D.,

     Defendant - Appellee.

No. 06-3096
(D. Ct. No. 03-CV-1283-JTM)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Circuit Judge, **BALDOCK**, and **TYMKOVICH**,
Circuit Judges.

---

Plaintiff-Appellant Frederick Berndt appeals the District Court's

order granting Defendant-Appellee Gary Kramer partial summary judgment

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be
cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

on Mr. Berndt's claim of negligence.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

On June 9, 2000, while working at the Stanton County, Kansas, Landfill, Mr. Berndt sustained a calcaneous fracture to his right heel.  That day, Dr. Kramer examined and treated Mr. Berndt.  The following day, Dr. Kramer ordered additional x-rays and CAT scans, but he did not immediately perform surgery on the fracture because he wanted to allow time for the swelling to decrease and the wound to stabilize.  On June 14, Dr. Kramer operated on Mr. Berndt's foot in order to repair the fracture.  Mr. Berndt was released from the hospital on June 19.

Mr. Berndt saw Dr. Kramer again on July 6.  From the time of his surgery until his follow-up visit on July 6, clear fluid drained from the wound in his foot.  Even though he believed his foot was infected, he thought the drainage was a normal consequence of the surgery.  Sometime after July 6, however, the fluid appeared yellow and seemed to contain pus.  When Mr. Berndt saw Dr. Kramer again on July 18, the doctor told him that his wound was infected.

A couple days later, on July 20, Dr. Kramer examined Mr. Berndt again.  When Dr. Kramer manipulated his foot, black material, as well as pus, was released from the wound.  Dr. Kramer sent Mr. Berndt to the

hospital that same day to receive a shot for the infection. At this time, Mr. Berndt was very concerned about his wound, which he continued to think was infected. On July 28, Mr. Berndt was aware that the wound was draining constantly and that the infection remained. The fluid draining from the wound never again appeared clear, but instead turned red and pus-colored. In his deposition, Mr. Berndt acknowledged that he was worried about Dr. Kramer's care during this time, but that Dr. Kramer always reassured him and explained to Mr. Berndt's satisfaction that he knew what he was doing.

On August 4, Dr. Kramer operated again on Mr. Berndt's foot to irrigate and aerate the wound. A culture done that day revealed the presence of pseudomonas, the bacteria causing the infection. According to Mr. Berndt, Dr. Kramer told him that this bacteria was just a "foot bug," and he should not worry about it.

Because Dr. Kramer would not say how bad the infection was, Stanton County's workers' compensation carrier sent Mr. Berndt to see Dr. Gilbert, another orthopedic surgeon, on September 1. In his deposition, Mr. Berndt testified that Dr. Gilbert told him he had a "very bad infection," which he would "take to the grave with" him. Mr. Berndt explained that he understood this to mean that, although treatment may "put it to sleep," the infection was "going to always be there" and "even a bad cold could wake it

up." He also testified that Dr. Gilbert said that he might have just "left the foot" and not performed the surgery, but he indicated that whether to operate is a "doctor's decision." In addition, Mr. Berndt testified that Dr. Gilbert did not criticize Dr. Kramer's care, indicating instead that the antibiotics Dr. Kramer had prescribed "should do the trick."

On October 17, Dr. Kramer referred Mr. Berndt to Dr. Peterie, a physician specializing in infectious disease. During his examination of Mr. Berndt on October 24, Dr. Peterie told Mr. Berndt that he had permanent tinnitus (i.e., ringing in his ears) and possible kidney damage as a result of an antibiotic, Tobramycin, administered by Dr. Kramer to treat the infection from August 15 to September 12. According to Mr. Berndt, Dr. Peterie recommended that his foot be amputated because it was broken so badly that it was not "worth a darn," even if the infection could be treated.

Mr. Berndt continued to see Dr. Kramer for treatment through February 2001. That same month, he was examined by Dr. Shields, who concluded that Mr. Berndt had fluid within the bone surrounding the calcaneous fracture consistent with an infection. She presented Mr. Berndt with three treatment options, including amputation. Mr. Berndt chose amputation, rather than continuing to fight the infection, and on March 7, 2001, his leg was amputated right below the knee.

On October 24, 2002, Mr. Berndt filed a petition requesting the convening of a medical malpractice screening panel pursuant to Kan. Stat. Ann. § 65-4901. The following July, the parties agreed to dismiss the screening panel. And on August 5, 2003, Mr. Berndt filed suit in federal district court, asserting diversity jurisdiction and seeking damages resulting from Dr. Kramer's alleged negligence. The District Court granted Dr. Kramer's motion for partial summary judgment, finding Mr. Berndt's claim for damages resulting from his infection barred by a two-year statute of limitations under Kansas law. *See* Kan. Stat. Ann. § 60-513(a)(7). The court subsequently denied Mr. Berndt's motion for reconsideration, but it granted Mr. Berndt leave to file an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), which this Court denied. After the parties supplemented the record with additional facts, the District Court granted Dr. Kramer's motion for partial summary judgment on the issue of whether any subsequent, intervening negligent actions occurred on or after October 24, 2000, which led to the amputation of Mr. Berndt's lower right extremity. After the court entered summary judgment on this issue, the only remaining issue was Mr. Berndt's claim for damages based on the tinnitus injury. The parties reached a settlement on this issue in February 2006, leaving no further issues for trial. Mr. Berndt now appeals the District Court's grant of summary judgment in Dr. Kramer's favor with respect to his claim for

damages resulting from the bacterial infection. The sole issue on appeal is whether Mr. Berndt's claim is barred by the Kansas statute of limitations.[1]

## II. DISCUSSION

We review a district court's grant of summary judgment de novo. *Bradley v. Val-Mejias*, 379 F.3d 892, 896 (10th Cir. 2004). A moving party is entitled to summary judgment if the record "show[s] that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). In reviewing the record, "we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Bradley*, 379 F.3d at 897 (quotation omitted). We also review a district court's interpretation of state law de novo. *Id.*

A. Kansas Statute of Limitations

---

[1] In October 2006, the District Court denied Mr. Berndt's Rule 59(e) motion to alter or amend the court's entry of summary judgment on the issue of intervening negligent acts leading to the amputation. *See* Fed. R. Civ. P. 59(e). Mr. Berndt appeals all four district court orders: the first order granting Dr. Kramer partial summary judgment, the order denying Mr. Berndt's subsequent motion to reconsider this order, the order granting Dr. Kramer summary judgment on the issue of intervening negligent acts, and the subsequent order denying Mr. Berndt's Rule 59 motion. Although he appeals all four orders, he only argues one issue on appeal. In his brief, Mr. Berndt does *not* argue that subsequent, intervening acts occurring on or after October 24, 2000, led to the amputation. In addition, he acknowledges that the injury giving rise to damages is the infection that led to the amputation, not the amputation itself. The only issue on appeal is therefore whether Mr. Berndt's claim for damages resulting from the infection is barred by the Kansas statute of limitations.

Generally, under Kansas law, a plaintiff must file a medical malpractice action within two years of the act allegedly causing the injury. Kan. Stat. Ann. § 60-513(a)(7). But if the plaintiff's injury is not "reasonably ascertainable" at the time of the alleged negligence, the limitations period does not begin to run until "the fact of injury becomes reasonably ascertainable":

> A cause of action arising out of the rendering of or the failure to render professional services by a health care provider shall be deemed to have accrued at the time of the occurrence of the act giving rise to the cause of action, unless the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of the injury becomes reasonably ascertainable to the injured party, but in no event shall such an action be commenced more than four years beyond the time of the act giving rise to the cause of action.

*Id.* § 60-513(c). The Kansas Supreme Court has stated that the phrase "'reasonably ascertainable' does not mean 'actual knowledge.'" *Davidson v. Denning*, 914 P.2d 936, 948 (Kan. 1996). Rather, whether the injury was reasonably ascertainable requires the application of "an objective standard based upon an examination of the surrounding circumstances." *P.W.P. v. L.S. & Johnson County Mental Health Ctr.*, 969 P.2d 896, 902 (Kan. 1998).

Typically, under Kansas law, "objective knowledge of the injury, not the extent of the injury, triggers the statute" in medical malpractice cases. *Id.* But when a medical procedure or treatment causes the plaintiff's injury,

the Kansas courts have asked when the plaintiff should have known that the injury was substantial or permanent. *See Jones v. Neuroscience Assocs., Inc.*, 827 P.2d 51, 59 (Kan. 1992) (holding that a fact issue remained as to when the plaintiff knew her condition caused by surgery was "permanent, *i.e.*, substantial"); *Hecht v. First Nat'l Bank & Trust Co.*, 490 P.2d 649, 655 (Kan. 1971) (holding that plaintiff's "knowledge of her condition from her own observation, and that acquired from her physicians" did not show as a matter of law that her post-treatment injury was substantial and reasonably ascertainable). As these cases demonstrate, when an injury results from a medical procedure that requires a recovery period, the fact of injury is not reasonably ascertainable until the plaintiff should know that the condition is not part of a normal recovery. Permanency indicates that the condition will persist beyond the recovery period as a separate injury. *See Cleveland v. Wong*, 701 P.2d 1301, 1306 (Kan. 1985) (noting that, without any indication that the condition was permanent, "[t]he symptoms of the injury were known to the plaintiff, but the fact of injury was not reasonably or immediately ascertainable"). In short, when the injury is a result of a medical procedure, the injury is reasonably ascertainable either when the plaintiff has reason to know the injury is permanent or when the plaintiff has reason to suspect negligence. *See id.* (holding that the plaintiff's injury was not reasonably

- 8 -

ascertainable when he had no reason to suspect that his conditions following surgery were permanent or the result of negligence).

Furthermore, when the plaintiff has reason to know the injury is permanent, the cause of action accrues even if the plaintiff does not know that a negligent act caused the injury. *See Kelley v. Barnett*, 932 P.2d 471, 477 (Kan. Ct. App. 1997) ("If plaintiffs were allowed to wait to commence suit until directly confronted with evidence of negligence, the statute of limitations would almost never begin to run."). In applying the same statute of limitations to a wrongful death action, the Kansas Supreme Court explained why knowledge of negligence is not required: "The phrase 'reasonably ascertainable' [in Kan. Stat. Ann. § 60-513(c)] means that a plaintiff has the obligation to reasonably investigate available sources that contain the facts of the death and its wrongful causation." *Davidson*, 914 P.2d at 948. Unless "information from which the fact of death or negligence can be determined was either concealed, altered, falsified, inaccurate, or misrepresented," the plaintiff "is charged with constructive knowledge of information that is available through a reasonable investigation." *Id.* at 947. In other words, once the injury is reasonably ascertainable, the plaintiff has a duty to investigate whether negligence caused the injury. The Kansas Supreme Court's interpretation of the statute of limitations in *Davidson* applies not only to wrongful death actions, but to medical malpractice

actions as well.  *P.W.P.*, 969 P.2d at 901.  The question in the instant case is, therefore, when Mr. Berndt knew or should have known that his injury (i.e., the infection) was permanent, thereby triggering his duty to investigate whether negligence caused the injury.

B.      When Mr. Berndt's Injury Became Reasonably Ascertainable

Based on our review of the record, we agree with the District Court's determination that Mr. Berndt's injury was reasonably ascertainable on September 1, 2000, when Dr. Gilbert examined him and informed him the infection was serious and permanent.  In his deposition, Mr. Berndt acknowledged that Dr. Gilbert told him the infection was permanent at this point in time; even if treatment could "put it to sleep," Dr. Gilbert explained that it would still be present and could become symptomatic again in the future.  Because he did not file suit within two years of September 1, 2000, his claim for damages based on this injury is barred by the statute of limitations.[2]

Mr. Berndt contends, however, that the limitations period did not begin to run until, at the earliest, his examination by Dr. Peterie, who told him that amputation was a possibility and suggested that Dr. Kramer's care

_____

[2]Because Mr. Berndt requested the screening panel more than two years after he could reasonably ascertain the injury, the District Court did not decide whether the limitations period was tolled for part or all of the period between this request, on October 24, 2002, and August 5, 2003, when he filed his federal suit.  Using either date, the action is untimely.

may have been damaging. Mr. Berndt argues that Kansas law requires that a plaintiff have some indication that negligence caused the injury before the limitations period begins to run.[3] Hence, because Dr. Gilbert did not question Dr. Kramer's care, he claims that the negligent cause was not reasonably ascertainable on September 1, 2000. But as our previous discussion of Kansas law demonstrates, knowledge of a negligent act is not required for the limitations period to run. When the injury is reasonably ascertainable, a plaintiff has a duty to investigate possible negligence unless the information necessary to determine negligence is concealed or otherwise unreliable. *P.W.P.*, 969 P.2d at 901. Mr. Berndt does not argue that he did not have access to necessary information concerning potential negligence. He therefore had a duty to investigate once he was aware that his infection was permanent (i.e., once his injury was reasonably ascertainable).

---

[3] Specifically, Mr. Berndt argues that knowledge of a condition's permanence is not the "decisive factor" under Kansas law, particularly when the condition is a foreseeable consequence of a medical procedure. But the logical implication of this argument is that a plaintiff must have objective knowledge of negligence before the limitations period begins to run. That is, if the permanence of Mr. Berndt's infection did not make the fact of injury reasonably ascertainable, the implication is that his injury was reasonably ascertainable only when he had reason to suspect a negligent cause. But as we explain above, in Kansas, a cause of action accrues when the injury is reasonably ascertainable, even if the plaintiff does not suspect a negligent cause. When the injury is reasonably ascertainable, the plaintiff "is charged with constructive knowledge of information" regarding potential negligent causes. *See Davidson*, 914 P.2d at 947.

Nevertheless, to support his argument that Kansas law requires some knowledge of negligence before a cause of action accrues, Mr. Berndt cites our decision in *Bradley v. Val-Mejias*, 379 F.3d 892 (10th Cir. 2004). He notes that, in interpreting the same Kansas statute in *Bradley*, we held that the limitations period started to run when the plaintiff was aware of his doctor's negligent diagnosis. *Id.* at 898. But Mr. Berndt's reliance on this case is misplaced because, as we clearly stated in *Bradley*, the misdiagnosis *was* the injury. *See id.* at 899 (describing the plaintiff's injury as the fact that the doctor "was not properly treating his condition"); *see also Brock v. Gatz*, 2007 WL 1589412, at *5 (10th Cir. 2007) (unpublished) (stating that, in a misdiagnosis case, the legal injury is the improper treatment and delayed diagnosis). Unlike the present case, a medical procedure did not cause the plaintiff's symptoms in *Bradley*; instead, the defendant physician failed to treat an existing condition. In cases such as this, the injury—the absence of adequate treatment—is reasonably ascertainable when the plaintiff has reason to know of the misdiagnosis. *See Bradley*, 379 F.3d at 899 (noting that the plaintiff was aware he had been injured, even though he was unaware of the "scientific nature" of his injuries, when he had reason to question his doctor's diagnosis (quotation omitted)). Indeed, the plaintiff cannot discover the injury without some indication of possible negligence. Conversely, in the case before us, the injury (i.e., the infection resulting

from the surgery) was reasonably ascertainable without any knowledge of possible negligence. In Kansas, objective knowledge of the injury triggers the duty to investigate a potentially negligent cause. *Davidson*, 914 P.2d at 947–48; *see also P.W.P.*, 969 P.2d at 902 (citing *Friends Univ. v. W.R. Grace & Co.*, 608 P.2d 936, 940 (Kan. 1980), in which the Kansas Supreme Court held "that the statute began to run when a new roof was found to be leaking, not when the expert later discovered the cause"); *Kelley*, 932 P.2d at 476–77 (rejecting the argument that "the causal connection between the injury and the negligence of the defendants must have been identifiable before the statute of limitations began to run"). Mr. Berndt therefore had an obligation to investigate possible negligence when the fact of his injury was reasonably ascertainable on September 1, 2000.

Mr. Berndt also argues that his injury was not reasonably ascertainable on September 1, 2000, because Dr. Kramer continued to treat him until February 2001. Although he acknowledges that Kansas courts have rejected the continuous treatment doctrine, *see P.W.P.*, 969 P.2d at 903–04, he contends that evidence of an ongoing relationship between the patient and the defendant physician is relevant in determining when an injury is reasonably ascertainable, *see Jones*, 827 P.2d at 59. In support of this contention, he cites *Jones v. Neuroscience Associates, Inc.*, in which the Kansas Supreme Court held that an ongoing patient-physician relationship

- 13 -

"is relevant upon the issue of when it was reasonably apparent to [the plaintiff] that her injury was permanent, *i.e.*, substantial." *Id.* In *Jones*, however, none of the plaintiff's physicians told her that her condition, which was a result of surgery, was permanent until after she filed suit. *Id.* at 54. Her relationship with the defendant physicians was therefore relevant to determining when she should have known her injury was permanent. *See id.* at 59 (noting the evidence regarding the injury's permanence was "inconclusive" and therefore created a question of fact for the jury). Here, however, the evidence as to when the injury's permanence was reasonably ascertainable is not in dispute; Mr. Berndt acknowledges that Dr. Gilbert told him the infection was permanent on September 1, 2000. His ongoing relationship with Dr. Kramer is therefore irrelevant with respect to this issue.

In addition to *Jones*, Mr. Berndt argues that his case is analogous to *Cleveland v. Wong*, 701 P.2d 1301 (Kan. 1985), and *Hecht v. First National Bank & Trust Co.*, 490 P.2d 649 (Kan. 1971). In both these cases, the Kansas Supreme Court noted that the evidence presented a question of fact as to when the injury was reasonably ascertainable. *Cleveland*, 701 P.2d at 1306; *Hecht*, 490 P.2d at 655–56. But in both cases, the plaintiffs had no reason to suspect that conditions resulting from medical treatment were permanent; none of the plaintiffs' physicians had indicated that their

conditions were permanent or a result of negligence. *Cleveland*, 701 P.2d at 1306; *Hecht*, 490 P.2d at 655. Conversely, Mr. Berndt testified that Dr. Gilbert told him that he would take his infection "to the grave" with him. According to Mr. Berndt, Dr. Gilbert indicated that treatment might "put it to sleep," but the infection would "always be there." Because Mr. Berndt clearly had reason to know that his infection was permanent after seeing Dr. Gilbert, no genuine issue of material fact remains as to when Mr. Berndt's injury was reasonably ascertainable. Consequently, we find that the statute of limitations began to run on September 1, 2000, and the instant action is therefore untimely.

### III. CONCLUSION

Because Mr. Berndt's cause of action is barred by the statute of limitations, we AFFIRM the District Court's grant of summary judgment in favor of Dr. Kramer on Mr. Berndt's claim for damages resulting from the infection.

ENTERED FOR THE COURT,

Deanell Reece Tacha
Chief Circuit Judge