No. 78,803

P.W.P., *Appellant,* v. L.S. and JOHNSON COUNTY MENTAL
HEALTH CENTER, *Appellees.*

(969 P.2d 896)

418

Opinion filed December 18, 1998.

*James T. Wiglesworth,* of Overland Park, argued the cause and was on the brief for appellant.

*Scott K. Logan,* of Logan & Logan, L.C., of Prairie Village, argued the cause, and *M. Bradley Watson* and *Jeff K. Brown,* of the same firm, were with him on the brief for appellee Johnson County Mental Health Center.

*Todd A. Scharnhorst,* of Blackwell Sanders Peper Martin L.L.P., of Overland Park, argued the cause, and *Roger W. Warren* and *Stephen J. Torline,* of the same firm, were with him on the brief for appellee L.S.

The opinion of the court was delivered by

LARSON, J.: P.W.P (patient) appeals the trial court's determination that the statute of limitations expired on her claims for damages against L.S. (therapist) and the Johnson County Mental Health Center (JCMHC).

The petition filed on May 23, 1995, alleged patient obtained counseling services from JCMHC provided by its employee, L.S., a therapist and licensed social worker, who negligently and improperly entered into a social and sexual relationship with her commencing in 1985, causing substantial emotional damage. Patient asserted claims for negligence, intentional infliction of emotional distress, and refund of money paid for financial assistance she provided to therapist and her family.

The trial court found in granting summary judgment that, as a matter of law, injuries to patient were reasonably ascertainable prior to May 23, 1993. Summary judgment was granted on the action for money paid based on a lack of evidence of the claim and because the applicable statute of limitations had run.

Patient appeals, contending the trial court erred (1) in holding the statute of limitations had run against all her claims and (2) in holding, as a matter of law, that she had failed to establish a cause of action for money paid.

We will set forth with considerable detail the history of the interaction between the two parties because critical to the ruling is the applicable time when the existence of the alleged cause of action was reasonably ascertainable.

*Facts, admissions, and deposition testimony*

The parties' first involvement was on October 7, 1985, when patient sought treatment from JCMHC for emotional problems and a mental disorder.

A social and sexual relationship developed between therapist and patient with patient contending it began November 13, 1985, and continued until mid-1993. Therapist admits she attended social functions with the patient, including the patient's wedding in 1986. The record reflects the patient and therapist took vacations together, met for lunch and dinner through 1993, and jointly held Christmas parties.

After January 1986, neither patient, nor her insurance carrier paid any money to JCMHC. Patient is unable to point to any payments made to therapist after 1986 that were specifically intended to compensate her for providing therapy. Patient admits she did not make any requests to her insurance company for payment for therapy services provided by either therapist or JCMHC after 1986.

During a custody dispute between therapist and her then-husband, patient testified under oath in a deposition and denied any sexual relationship with therapist.

During the course of her relationship with therapist, patient drafted numerous documents detailing her thoughts about the relationship. Patient admitted in deposition testimony as well as in response to request for admissions that the documents were written or expressed her thoughts in 1985 and 1986, showing how she felt at that time. Patient believed at the time she created the documents that she had sufficient evidence to sue JCMHC.

Therapist questioned the authenticity of the documents as well as the dates they were written. When three of the documents were examined by an expert, his report stated they could not have been written until sometime after May 1995.

Patient testified that the first time she and therapist had sex she knew it was wrong for them to engage in such activity. Patient admits that as early as 1986, she received notes from therapist referring to their relationship as "crossing the lines." Patient testified that she understood this to mean that the therapist had a conflict with the professional and sexual relationships occurring simultaneously.

Patient's handwritten notes setting forth her feelings in November 1985 contain statements such as "What the hell am I doing sleeping with my therapist? . . . My God what have I gotten into? . . . Am I so desperate for love and acceptance that I can't tell this woman how wrong this is—for her to be having sex with a client—someone who asked to be healed—not preyed on . . . she can never take back what she has done to me."

In a handwritten letter to therapist written by patient in approximately December 1986, she wrote: "I would win—hands down—If I wanted to I could destroy both of you both job-wise and personally—and financially. . . . If I hated you enough to do that in the first place—I would have more than enough 'evidence' to sue your place of employment."

Patient discussed her relationship with other therapists and with other counselors. In 1989 or 1990, Barbara Dickerson counseled patient and explained to her some of the ramifications of having a relationship with her therapist.

Before patient talked to Dickerson or other therapists she made each therapist agree in advance that they would not file an ethical complaint against therapist. Patient contends the agreements were necessary because therapist had threatened to commit suicide by putting "a bullet to the head" if patient revealed the relationship, and that would have devastated her emotionally.

Janet Culp, another therapist, informed patient that the relationship with her therapist was "inappropriate" and "unethical." The date she saw Culp is not clear, although patient also sought counsel from other therapists between 1987 and 1994. These included Rosalie Pompushko, who counseled patient from 1987 until 1993.

Patient contends the therapeutic relationship continued until late 1993 and that any payments made between 1986 and 1993 should be considered payment for therapy. Patient was unable to pinpoint any payment made to therapist subsequent to 1986 for therapeutic services. Patient's list of checks she claimed were payments were all dated prior to February 19, 1990, except for one $400 check written on September 26, 1993. Patient admitted that therapist wrote a lot of checks to her and she wrote a lot of checks to therapist. Patient contends the parties did not always repay the sums loaned but admits that repayment was never requested. When asked to identify the specific sums loaned, patient responded, "I didn't keep close track. A lot of money exchanged hands both ways." Patient admitted she had only a vague recollection that some amounts were not repaid, and she was unable to identify any specific amount owed to her by her therapist.

Therapist and JCMHC each filed separate motions for summary judgment, arguing that the letters written in 1985 and 1986, together with patient's sworn testimony, clearly showed that she had realized her cause of action and injury as early as 1985. Both defendants insisted patient's claims were barred by the 2-year statute of limitations.

Through an affidavit attached to her response to the summary judgment motions, patient attempted to controvert her own deposition testimony regarding the time that the letters were written. Patient's signed affidavit stated: "Between 1985 and until late 1993 or early 1994, I have experienced situations where certain places, songs, and occurrences would cause me to relive, like flashbacks, encounters between me and [therapist]. These episodes were real to me and it is possible I wrote [the documents] during one of these episodes."

Patient claimed her affidavit, together with the defendant's expert's report, created a disputed material issue of fact as to the time she could have reasonably ascertained her injury.

Patient argued her statement of December 1986, that she had "more than enough evidence to sue your place of employment," was taken out of context and was not related to any injury caused by her relationship with therapist, but was due to information pa-

tient received from therapist regarding the alleged sexual preferences of JCMHC employees.

Additionally, patient attempted to avoid summary judgment with additional arguments that the doctrine of transference tolled the statute, the continuing relationship doctrine applied to toll the statute, and the duress she endured because of the alleged threats of suicide also should toll the statute.

The trial court issued a well-reasoned and comprehensive memorandum decision, granting summary judgment to both defendants, holding uncontroverted evidence established that patient was well aware of the fact of her injury by 1986, or at the latest by 1990. The trial court found that patient's affidavit written after the defendants filed their motions for summary judgment could not be used to controvert her sworn testimony or admissions she had made. The trial court further held that patient could not use the expert witness report to contradict her own sworn testimony as to the date the documents were written, for to do so, reasoned the court, was to introduce fraudulent evidence in an attempt to avoid summary judgment.

The trial court held that patient's claim for damages against JCMHC and therapist is a tort claim barred by the 2-year limitations period and, further, patient did not present sufficient evidence to support any claim that there were any funds paid to the therapist on the condition they be repaid. Because patient's tort claims were not filed until May 23, 1995, the 2-year statute of limitations barred her claims, and judgment was entered on behalf of both defendants.

Standard of Review

The well-established rules concerning the grant of summary judgment were recently set forth in *Saliba v. Union Pacific R.R. Co.*, 264 Kan. 128, 131-32, 955 P.2d 1189 (1998), as follows:

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . [Citations omitted.]

"When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. [Citations omitted.] In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case.

". . . On appeal we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]"

## We have further said that

" '[a]n issue of fact is not genuine unless it has legal controlling force as to a controlling issue. . . . A disputed question of fact which is immaterial to the issues does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of a material fact.' " *Seabourn v. Coronado Area Council, B.S.A.*, 257 Kan. 178, 189, 891 P.2d 385 (1995) (quoting *Secrist v. Turley*, 196 Kan. 572, 575, 412 P.2d 976 [1966]).

## *Are patient's tort-based claims barred by the statute of limitations?*

Patient's initial assertion that neither defendant is a health care provider is clearly erroneous. Under the provisions of K.S.A. 40-3401(f) and (n), JCMHC is a "health care provider." An examination of these same statutory provisions shows that while she is an employee of a health care provider, therapist is not a health care provider as statutorily defined. Consequently, the statute of limitations in this case is the period of 2 years as provided under K.S.A. 60-513(a)(4) and (7), which reads as follows:

"(a) The following actions shall be brought within two years:

. . . .

"(4) An action for injury to the rights of another, not arising on contract, and not herein enumerated.

. . . .

"(7) An action arising out of the rendering of or failure to render professional service by a health care provider, not arising on contract."

The accrual provisions of K.S.A. 60-513(b), apply to the claims against therapist and read as follows:

"(b) Except as provided in subsection (c), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably

ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."

As to the claim against JCMHC, a health care provider, the provisions of K.S.A. 60-513(c) relating to the accrual of the cause of action apply and reads as follows:

"(c) A cause of action arising out of the rendering of or the failure to render professional services by a health care provider shall be deemed to have accrued at the time of the occurrence of the act giving rise to the cause of action, unless the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall such an action be commenced more than four years beyond the time of the act giving rise to the cause of action."

Both subsections (b) and (c) are similar in that the statute of limitations is triggered either when substantial injury occurs or, if the injury is not reasonably ascertainable at that time, when it is reasonably ascertainable. They differ only in that under subsection (b) the action must be commenced within 10 years beyond the time of the act giving rise to the action while under (c) the action must be commenced within 4 years beyond the time of the act giving rise to the cause of action.

The crucial issue in this case is when did the cause of action first cause substantial injury or, if the fact of injury was not reasonably ascertainable until sometime after the initial act, when did the fact of injury become reasonably ascertainable to the injured party.

In *Davidson v. Denning*, 259 Kan. 659, 914 P.2d 936 (1996), we most recently analyzed the 2-year statute of limitations for both medical malpractice actions and wrongful death actions. In setting forth when a plaintiff should have discovered or reasonably ascertained that a cause of action existed, Justice Six, writing for our court, stated:

"K.S.A. 60-513(b) and (c) provide that the limitations period starts when the 'fact of injury' becomes 'reasonably ascertainable' Inherent in 'to ascertain' is 'to investigate.' 'Reasonably ascertainable' does not mean 'actual knowledge.' The 'fact of injury' in a wrongful death action means the 'fact of death.' The limitations period should start on the date of death unless the information from which the

fact of death or negligence can be determined was either concealed, altered, falsified, inaccurate, or misrepresented. The fact of death should be a starting point for inquiry. The wrongful death plaintiff is charged with constructive knowledge of information that is available through a reasonable investigation of sources that contain the facts of the death and its wrongful causation." *Davidson*, 259 Kan. 659, Syl. ¶ 2.

This language is applicable to medical malpractice actions and to the causes of actions alleged in this case. We further stated that the term "reasonably ascertainable," as applied in K.S.A. 60-513(b) and (c), suggests an objective standard based upon an examination of the surrounding circumstances. 259 Kan. at 669. See *Bonin v. Vannaman*, 261 Kan. 199, 929 P.2d 754 (1996); *Bold v. Spitcaufsky*, 24 Kan. App. 2d 135, 942 P.2d 652 (1997); *Kelley v. Barnett*, 23 Kan. App. 2d 564, 932 P.2d 471 (1997).

It is clear that Kansas courts have held the objective knowledge of the injury, not the extent of the injury, triggers the statute both in medical and nonmedical malpractice cases. *Jones v. Neuroscience Assocs., Inc.*, 250 Kan. 477, 827 P.2d 51 (1992); *Friends University v. W.R. Grace & Co.*, 227 Kan. 559, 608 P.2d 936 (1980) (holding that the statute began to run when a new roof was found to be leaking, not when the expert later discovered the cause); *Roe v. Diefendorf*, 236 Kan. 218, 222, 689 P.2d 855 (1984) (statute of limitations began to run when plaintiff first injured back, not later when extent of back injury was determined).

Application of an objective standard here can only lead to the conclusion that patient suffered substantial injury and was actually aware of it well before May 23, 1993, which is 2 years prior to the filing of suit. Her statements of 1985 and 1986, which have been previously set forth, regardless of the dispute as to when she wrote them, reflected her feelings and understandings and unequivocally demonstrate knowledge of a substantial injury as of that period of time.

In addition, meetings with several new therapists in 1989 or 1990 confirmed that the extent of patient's alleged injuries were reasonably ascertainable, based upon an objective standard. The statute of limitations against her allegations has clearly run unless tolled

by at least one of the additional arguments she makes in an attempt to sustain her claim.

Patient first argues the doctrine of transference keeps the statute of limitations from running. Second, she argues that the cause of action remains alive whenever a therapist has a "continuing relationship" with a patient. Third, she argues she was under duress which tolls the statute of limitations. Fourth, she argues that an adverse inference should be drawn against JCMHC for losing her records.

Patient additionally attempts on appeal to make a "continuing tort" argument that her contacts with therapist were separate damage events, which was not considered by the trial court. Under this contention, each contact with therapist within 2 years of the filing gave rise to a separate claim upon which damages can be recovered. Finally, patient makes a controverted facts argument whereby she attempts to counteract her own sworn testimony with additional sworn testimony and create a factual issue thereby.

None of these contentions requires reversal of the trial court, but we will consider each briefly in order.

*Did the transference phenomenon toll the statute of limitations?*

Whether the trial court should have applied the transference doctrine under the facts of this case is a question of law over which our review is unlimited. See *City of Chanute v. Polson*, 17 Kan. App. 2d 159, 160, 836 P.2d 6 (1992).

In an attempt to raise arguments sufficient to toll the statute of limitations, patient first argues therapist mishandled the transference of her feelings to the therapist, which made her incapable of ascertaining her injury, and therefore tolling the statute of limitations.

The transference phenomenon is a psychiatric doctrine which basically states that a patient will transfer or shift her affections or hostile emotions to the patient's therapist. It was recognized in Kansas in *Seymour v. Lofgreen*, 209 Kan. 72, 75, 495 P.2d 969 (1972).

This phenomenon is discussed in *Simmons v. United States*, 805 F.2d 1363, 1364-66 (9th Cir. 1986), where it was recognized that

failure by a therapist to recognize and deal appropriately with the phenomenon may be the basis for a malpractice action.

The transference phenomenon was applied in *Simmons* to toll the statute of limitations because there was evidence that the transference had prevented the patient from ascertaining his or her injury. Such is not the factual situation here. Patient was not prevented from ascertaining her injury. As we have stated earlier, she clearly knew of her injury, most probably in 1985, 1986, 1987, and without doubt by 1990, when she consulted with outside therapists. The transference doctrine is not applicable under the facts of this case to toll the statute of limitations.

*Did the continuous treatment doctrine toll the statute of limitations?*

Patient argues the statute of limitations is tolled because her patient-therapist relationship with therapist continued within 2 years of the time her action was filed. She essentially cites nonmedical practice cases involving attorneys and clients, such as *Morrison v. Watkins*, 20 Kan. App. 2d 411, Syl. ¶¶ 3-5, 889 P.2d 140, *rev. denied* 257 Kan. 1092 (1995), and *Pittman v. McDowell, Rice & Smith, Chtd.*, 12 Kan. App. 2d 603, 608-09, 752 P.2d 111, *rev. denied* 243 Kan. 780 (1988).

The trial court found this argument unavailing for two reasons. First, it had never been applied in Kansas in a therapist-patient case. In cases most similar involving doctor-patient relationships, the continuous treatment doctrine is not available since it was not included in the language of K.S.A. 60-513. See *Hecht v. First National Bank & Trust Co.*, 208 Kan. 84, 490 P.2d 649 (1971). The second reason the trial court relied upon was that while a continuing relationship may in some cases create a fact issue as to when the substantial injury was reasonably ascertainable (as it did in *Jones v. Neuroscience Assocs., Inc.*, 250 Kan. 477, here it is objectively beyond question that patient was aware she had suffered substantial injury caused by therapist well before May 23, 1993 (2 years before her action was brought).

While the relationship between a patient and a therapist is not exactly that of a physician-patient, it is much more akin to that of

a physician and patient than it is to that of an attorney and client. JCMHC is a health care provider, and therapist was its employee at the time therapy was first provided. Medicine was prescribed and treatment suggested, and we examine this argument in light of our decisions relating to the providing of treatment by professionals in the health care environment, whether therapist is statutorily so designated or not.

In cases dealing with the providing of medical services, Kansas has held that continuing treatment after the realization of injury does not toll the statute of limitations. We first stated in *Hecht* that while the doctrine of continuous treatment in a patient-physician situation had support in other jurisdictions, it was not applicable in Kansas:

"The Kansas legislature preempted policy making on the subject by enacting in 1963 the additional provision of 60-513 and has given the matter further consideration by enacting in 1970 additional provisions relating to injuries resulting from ionizing radiation. (See K.S.A. 1970 Supp. 60-513a, 60-513b and 60-513c.) The legislature did not see fit to mention either 'physician-patient relationship' or 'continuous treatment' as an element in measuring the time in which a cause of action accrues. We are not inclined to do so by judicially legislating." 208 Kan. at 93-94.

The relationship was considered in *Cleveland v. Wong*, 237 Kan. 410, 701 P.2d 1301 (1985), and *Jones* as to the issue of when the fact of the injury became reasonably ascertainable. The precise issue before us was most recently considered in *Bonin v. Vannaman*, 261 Kan. at 228, where the plaintiff in a medical malpractice action contended that since the doctrine of continuous representation had been applied to attorneys, a doctrine of continuous treatment should be applied to physicians.

Although a statute of repose issue existed in *Bonin*, which does not exist here, Justice Abbott, speaking for an unanimous court, approved the trial court's rejection of the continuous treatment doctrine, noting that the doctrine had specifically been rejected in *Becker v. Floersch*, 153 Kan. 374, Syl., 110 P.2d 752 (1941); *Hill v. Hays*, 193 Kan. 453, Syl. ¶ 3, 395 P.2d 298 (1964); and *Hecht*, 208 Kan. 84. 261 Kan. at 225. *Bonin* stated: "[T]his court does not

recognize the continuous treatment doctrine in the context of a medical malpractice action." 261 Kan. at 228.

We are not prepared to spawn a new and different rule from that enumerated in *Hecht* down through *Bonin* in situations such as the one we here face. The same rule applies to both JCMHC and therapist, and the statute of limitations is not tolled by the continuing interaction between patient and therapist.

*Did the patient's alleged duress toll the statute of limitations?*

Patient argues that the threat of therapist to commit suicide by putting "a bullet to the head" if patient revealed their relationship presents a factual issue for the jury to resolve, and the trial court erroneously held that the claim was barred by the statute of limitations.

Patient cited *Motor Equipment Co. v. McLaughlin*, 156 Kan. 258, 263-64, 133 P.2d 149 (1943), which held the statute of limitations did not commence to run against an action for relief from written instruments executed under duress, and *Rex v. Warner*, 183 Kan. 763, 771-72, 332 P.2d 572 (1958); *Bank v. Bay*, 90 Kan. 506, 509, 135 Pac. 584 (1913); and *Robinson v. Shah*, 23 Kan. App. 2d 812, 830, 936 P.2d 784 (1997), as authority.

Both defendants correctly point out that all of the cases cited by patient with the exception of *Robinson* are contract cases and are distinguishable from the instant case, which is a tort action. Furthermore, the courts in these cases expressly limited their holdings to situations where duress prevents a party from suing for breach of contract.

The *Robinson* case does have similarities in that it involves a medical malpractice action, but the Court of Appeals found the physician fraudulently concealed the fact of injury, resulting in a tolling of the statute. Such is clearly not the case here. There are no allegations of fraud or misrepresentation in this case. *Robinson* is not applicable.

The statutes involved do contain explicit provisions that toll the limitations period when a person is incapacitated. See K.S.A. 60-515. No such claim is made here. In fact, patient's expert witness,

Dr. Logan, testified he found no evidence of delusional thinking on her part.

The attempt to toll the statute of limitations based on an argument of duress is without merit.

*Should an adverse inference be premised upon JCMHC for losing patient's records?*

The loss of or inability of JCMHC to find records after a 10-year period does not provide any inferences susceptible of overriding the running of a statute of limitations. The statute of limitations was deemed to run because the fact of injury had been objectively reasonably ascertainable by patient, and the fact records of JCMHC could not be produced has no effect on this fact.

*Did patient present a valid claim for recovery of money?*

The uncontroverted evidence shows that checks were written between the parties but that there was "just a general vague recollection that some of the money was in the nature of a loan and not repaid." All of the payments occurred more than 2 years prior to the filing of any action except for one check of $400. There was no connection with JCMHC after 1986, and the evidence as to any potential claim against therapist was insufficient to present a claim to the jury. This issue fails because of lack of evidence and based upon the clear running of the statute of limitations.

*Did each contact between patient and therapist amount to a continuing tort?*

Patient appears to raise an issue not considered by the trial court, that each contact between the parties was a separate damage event such as might be found in a pollution case, citing *Williams v. Amoco Production Co.*, 241 Kan. 102, 108, 734 P.2d 1113 (1987).

This issue appears to be raised for the first time on appeal and would fail for that reason. However, the nature of the contact between the parties does not show separate and distinct causes of action giving rise to temporary damages as to each. *Williams* is not applicable. This issue is improperly raised and without merit.

*Did patient create triable factual issues by controverting earlier depositions, statements, and admissions by later affidavits in defense of summary judgment motions?*

The trial court carefully reviewed the differences which resulted from patient's deposition testimony and her admissions in an affidavit which later appeared to contradict these matters. The defendants argued that patient is bound by the responses made by requests for admission and that contrary statements and responses to summary judgment motions must be disregarded. In addition, defendants argued that the statement by patient in her request for admission and her depositions and statements may not be changed by a subsequent affidavit.

We have held that "[a]n affidavit cannot be used to controvert a prior sworn statement in order to create an issue of material fact and defeat a motion for summary judgment." *Bacon v. Mercy Hosp. of Ft. Scott,* 243 Kan. 303, 314, 756 P.2d 416 (1988); see *Mays v. Ciba-Geigy Corp.,* 233 Kan. 38, 41-47, 661 P.2d 348 (1983).

The trial court noted that no leave to withdraw an admission had been made and suggested that patient was on the edge of improper conduct or failed to demonstrate the existence of an honest error. The trial court concluded that its discretion to allow withdrawal of admissions should not be exercised under the facts of this case. It has been held in *Ropfogel v. United States,* 138 F.R.D. 579, 582 (D. Kan. 1991), that the decision of whether to permit withdrawal of an admission is a discretionary one.

The trial court's finding that the affidavit is contrary to patient's prior testimony as to when the documents were created or when the substance thereof was known is persuasive. In addition, the trial court properly found that regardless of when patient wrote the notes she knew a considerable period prior to May 23, 1993, that the improper therapy had caused her injury, and she could have sued therapist and JCMHC. This is not an issue which raises a material fact for determination by a jury and has no basis upon which summary judgment could be denied. The trial court's ruling as to this issue is correct.

We have considered all of patient's arguments and hold that summary judgment was properly granted.

Affirmed.