(36 P.3d 328)
No. 86,049

MARTHA B. HALL, *Appellant*, v. DARRELL MILLER, *Appellee*.

Opinion filed December 7, 2001.

*Michael L. Hodges*, of Shawnee Mission, and *James M. Crabtree*, of Crabtree Law Office, of Lenexa, for appellant.

*Gerald A. King* and *Lynn W. Hursh*, of Armstrong Teasdale LLP, of Kansas City, Missouri, for appellee.

Before GERNON, P.J., KNUDSON and BEIER, JJ.

KNUDSON, J.: The plaintiff, Martha B. Hall, appeals the grant of summary judgment in favor of the defendant, Darrell Miller. The trial court concluded that as a matter of law Hall's claims of negligence against Miller, a psychologist, and Sheridan G. Tucker, M.D., are barred under the applicable statute of limitations. Hall contends the trial court erred in granting summary judgment to Miller as there are material issues of fact precluding summary judgment. We agree and reverse the decision of the trial court.

This is not your conventional professional negligence case. Miller is a licensed clinical social worker who professionally counseled Hall from May 1984 through July 1994. Hall was referred back to Miller by Dr. Tucker for therapy as a result of depression ostensibly brought on by a bitter child custody dispute. In this litigation, Hall

contends that during her years of treatment Miller and Tucker implanted false memories of satanic ritual abuse, causing her present mental illness.

Gradually, over a lengthy period of time, Hall began to lose confidence in Miller's therapy and discontinued her individual counseling in October 1993. However, she did continue to attend Miller's group therapy classes through July 1994.

According to Hall, in May 1995, she told Dr. Tucker she did not believe Miller was correct that she had suffered from satanic abuse. Tucker told her that she had re-repressed her memories because she had stopped therapy and she would be forced to return when the memories reappeared. He assured her the memories would return within 5 years. Tucker even attempted to give Hall a copy of a satanic bible to help her accept the fact that satanic ritual abuse exists.

Sometime in early 1995, Hall read a magazine article which referred to false memories and subsequently, in July 1995, attended a local chapter meeting of the False Memory Syndrome Foundation (FMSF). According to Hall, this was the first time she was told of Miller's reputation for advocating the existence of Satanic cults and the fallacies of Satanic Ritual Abuse therapy. Hall next saw Dr. C. Raymond Lake, a psychiatrist. In Hall's supplemental response to Miller's motion for summary judgment, Dr. Lake's affidavit testimony was:

"1. I am a medical doctor with a Ph.D. in pharmacology. I am Board certified by the ABPN in general psychiatry and geropsychiatry, and by the ASCP in clinical psychopharmacology. I am currently a Professor with the Department of Psychiatry and Behavioral Sciences and Department of Pharmacology at the University of Kansas School of Medicine . . . .

"2. I first met Martha Hall on July 13,1995, as a result of a referral from Howard Fishman. She made and [sic] appointment and we met at my office at the KU School of Medicine.

"3. At that initial meeting, she related to me that she had recently attended a meeting with a local chapter of the False Memory Syndrome Foundation, and expressed a desire for a 'mental health check-up.'

"4. She related her original diagnosis of depression in 1984, and her subsequent course of treatment with Darrell Miller and Dr. Sheridan Tucker.

"5. At that initial visit, it was my opinion that she was not aware of the potential iatrogenic and destructive nature of the diagnoses and subsequent treatment advice given her by Darrell Miller.

"6. Over the course of subsequent visits (July 26, 1995 and August 8, 1995) Martha Hall began to gradually accept the causal link between her overall deterioration in function and the treatment she received from Darrell Miller.

"7. I do not believe that Martha Hall possessed sufficient facts or information that would have led her to believe that her therapist (Miller) was responsible for her deterioration in function prior to her attendance of the July 1995 FMSF meeting and her subsequent appointment with me."

## The trial court made the following findings in granting summary judgment to Miller:

"Plaintiff alleges negligence on the part of defendant Miller in misdiagnosing her as a multiple personality, leading her to believe a number of things that she claims to be untrue, including the following: that she had a history of sexual and/or satanic ritual abuse; that she had been impregnated by an alien; that her house had demons; and, therefore, that she should sell her house and family possessions; that she should sever her ties with her family; that her parents had pledged her to Satan; that her brother would kill her if she did not return to the cult; that she was a breeder for the cult; and, that she was a multiple personality. It is uncontroverted that by January of 1994, the plaintiff knew that she had not been in a Satanic cult nor was she a Satanic ritual abuse victim or a victim of sexual abuse; that she was not a multiple personality; that her house was not inhabited by demons; and that she was, in fact, back in contact with family members or in the process of getting back in contact with family members. To the extent that defendant's statement of uncontroverted facts are consistent with the court's statement of uncontroverted facts outlined above, those uncontroverted facts asserted in defendant Miller's Motion for Summary Judgment and Memorandum in Support thereof and Supplemental Memorandums in Support thereof are hereby adopted and incorporated as though fully set out herein.

"The Court further finds that the statute of limitations, K.S.A. § 60-513(b)(c) [sic], as interpreted by Kansas appellate courts requires that the standard for determining the statute of limitations is an objective standard that is based upon the surrounding circumstances and, therefore, it is objective knowledge that triggers the running of the statute of limitations. Applying that objective standard, the statute of limitations in this case commenced to run as to defendant Miller by January of 1994 and the facts surrounding that are uncontroverted."

## In announcing his ruling from the bench, the trial judge acknowledged:

"The uncontroverted facts are as follows: [Hall] received individual therapy from the Defendant Miller prior to October 29 of 1993; the individual therapy

ceased at that time. She continued in group sessions with the Defendant Miller through July 30 of 1994, and I don't believe there's any specific claim of any particular act that occurred on the 7-30-94 date in this case. This case was filed July 26, 1996.

"In this case, the plaintiff claims that—and I'm going to focus primarily on Miller misdiagnosed her as a multiple personality and led her to believe a number of what I could characterize as bizarre things that were, she claims to be, untrue. . . .

"It is uncontroverted by January of 1994 that the plaintiff knew that she had not been in a satanic cult nor was she a satanic abuse victim; that she was not a multiple personality; that her house was not inhabited by demons; and that she was at that time in the process—in fact, back in contact with family members.

". . . Objective knowledge, then, triggers the running of the statute of limitations.

"Certainly in this case I wish that there was a bright-line event. For example, in many cases there's a death; there's a doctor saying, 'oops'; there's sex between a patient and a therapist; or there is some specific injury. In this case, there certainly is not—no bright line when this statute of limitations would have commenced to run. However, I've concluded, I would have to say, with a lot of anguish that, applying the objective standard, that the statute of limitations would have commenced to run . . . by January of 1994."

The trial court also granted Dr. Tucker's motion for summary judgment.

Hall has filed a timely appeal, contending there are genuine issues of fact that preclude the grant of summary judgment to Miller. Specifically, Hall argues there are disputed facts as to when she knew or should have reasonably known she had sustained an iatrogenic injury as a result of Miller's therapy and counseling.

### Discussion

"The standard of review for a motion for summary judgment is well established. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. K.S.A. 60-256(c). On appeal, we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Jackson v. U.S.D. 259*, 268 Kan. 319, 322, 995 P.2d 844 (2000).

The parties agree the following provision under K.S.A. 2000 Supp. 60-513(b) is controlling:

"(b) Except as provided in subsections (c) and (d), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the action first causes substantial injury, or, *if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party,* but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action." (Emphasis added.)

The question of when the fact of an injury is reasonably ascertainable has been the subject of much analysis and discussion.

In *Hecht v. First National Bank & Trust Co.,* 208 Kan. 84, 490 P.2d 649 (1971), the plaintiff sued physicians who treated her for Hodgkin's disease with x-ray treatments. The trial court dismissed the suit after finding the claim was barred by the statute of limitations.

The plaintiff in *Hecht* had been diagnosed in 1964 with Hodgkin's disease and had completed a course of 20 radiation treatments with no significant adverse effects. In November 1965, she noticed lumps on her groin area, and in January 1966, she was diagnosed as suffering from a reoccurrence of the disease.

Twenty more treatments were planned. After the first treatment, given in January 1966, plaintiff complained of a strange "crawling like" sensation. 208 Kan. at 87. She received a second treatment. After the second treatment, the defendants determined she had suffered an abnormal skin reaction to the first treatment. She was given four more reduced treatments and then the treatments were totally discontinued because of the adverse skin reaction. Two weeks later, she was again examined by the defendants, who both told her the reaction was subsiding.

Approximately 2 weeks after her exam by the defendants, she had a consultation with a separate physician. The consulting physician confirmed the opinion given by the defendants. It was not until December 1966 that the plaintiff was advised by another physician that she had an ulcer in her groin area, the ulcer had been caused by the radiation, and the ulcer would never heal without surgical intervention. Plaintiff filed her petition in 1968.

The trial court, in granting summary judgment to the defendants, held: " 'In this case the *fact of injury* not only became ascertainable to the plaintiff before March 13, 1966, but she also had full knowledge of the fact of the burn injury and its progression to ulceration before that time.' " 208 Kan. at 85. In reversing the lower court, the Kansas Supreme Court observed:

"We believe a fair analysis of the testimony of the three physicians deposed clearly indicates that as of March 13, 1996, none of them had made a diagnosis or prognosis of plaintiff's condition in terms of substantial injury since it was too early to do so with reference to the time of the treatments and the healing condition of plaintiff at the time. *We do not believe that plaintiff's knowledge of her condition from her own observation, and that acquired from her physicians, is sufficient to justify a determination, as a matter of law, that she knew or could have reasonably ascertained on March 13, 1966, that she had suffered substantial injury caused by the alleged negligent treatment of defendants.*" (Emphasis added.) 208 Kan. at 92.

We find *Hecht* helpful in our analysis. Here, just as in *Hecht*, the issue is when Hall knew or could have reasonably ascertained that a substantial injury had been caused by Miller. Based upon the record before us, it is difficult to conclude that as a matter of law Hall, in her fragile mental state, knew or "could have reasonably ascertained" before 1995 when she first became aware of false memory syndrome that her psychiatric injury was caused by Miller. Significantly, it must be remembered that any reservations expressed by Hall as to the reliability of Miller's diagnosis were rebuffed by her physician and Miller's collaborator, Dr. Tucker.

In *Seymour v. Lofgreen*, 209 Kan. 72, 495 P.2d 969 (1972), the plaintiff was mistreated and misdiagnosed by a medical doctor, who did not diagnose her as suffering from mental illness. She was treated by the doctor between 1964 and 1967. In 1967, her family intervened and took her to a psychiatrist, who immediately admitted her to Research Hospital in Kansas City where she underwent shock treatments; from there, in 1968, she went to Osawatomie State Hospital. She filed her claim in 1970, approximately 1 year after she was discharged from Osawatomie. The Kansas Supreme Court affirmed the trial court's dismissal of her suit because it was not timely, finding the record showed "the fact of injury was as-

certained no later than April 25, 1967, by her family, her psychiatrist, and herself, when, having changed doctors, she began a new course of treatment." 209 Kan. at 77.

In the case now before us, Miller and Tucker successfully convinced Hall that she was a survivor of abuse suffered at the hands of her parents and friends, effectively eliminating her outside support system. Also, unlike *Seymour*, as soon as Hall discovered through evaluation by independent clinicians that Miller had caused her illness, not merely misdiagnosed it, she filed suit.

In *P.W.P. v. L.S.*, 266 Kan. 417, 969 P.2d 896 (1998), the court was asked to decide when a cause of action for negligent counseling services accrued. The court, relying on *Davidson v. Denning*, 259 Kan. 659, 914 P.2d 936 (1996), found that the term "reasonably ascertainable" in 60-513 requires application of an objective standard to the surrounding circumstances in order to determine when a patient obtains objective knowledge of an injury. *P.W.P.*, 266 Kan. at 424-25.

In *P.W.P.*, the plaintiff obtained counseling services from L.S. The plaintiff claimed L.S. had engaged in an improper social and sexual relationship with her, beginning in 1985. The relationship continued until mid-1993. The plaintiff admitted she knew that the sexual relationship was wrong the first time she engaged in the activity. She sought out opinions about the relationship from other counselors between 1987 and 1994. At least one therapist informed plaintiff that the relationship was inappropriate and unethical.

The trial court found that it was uncontroverted that plaintiff was well aware of her injuries as early as 1986 and at the latest by 1990, so her 1995 suit was barred by the 2-year statute of limitations. 266 Kan. at 422.

In upholding the trial court's decision, the Kansas Supreme Court found that under an objective standard the only possible conclusion, based on the record provided, was that the plaintiff was well aware of her injury prior to 1993. 266 Kan. at 425.

In dismissing plaintiff's claim that the statute of limitations should have been tolled because she continued treatment with the negligent therapist, the court noted that in some cases such continuing relationships may create a fact issue as to when an injury

is ascertainable. However, the court found that in plaintiff's case the record conclusively showed she was well aware she had suffered an injury prior to 1993. 266 Kan. at 427.

In *Davidson*, 259 Kan. 659, there was a bright line event, a death, that placed the plaintiff on notice that something out of the ordinary had occurred. The *Davidson* court found the statute of limitations began to run at that moment. 259 Kan. 659, Syl. ¶ 2; see *Roe v. Diefendorf*, 236 Kan. 218, Syl. ¶ 1, 689 P.2d 855 (1984); *Friends University v. W.R. Grace & Co.*, 227 Kan. 559, 563, 608 P.2d 936 (1980). However, when dealing with a person's mental condition, such bright line events may not be present that would trigger the discovery rule in K.S.A. 2000 Supp. 60-513(b). Clearly, in *P.W.P.*, the plaintiff was aware from the moment she engaged in sexual activities that something was wrong. She sought out advice from independent therapists who told her the behavior was wrong. The facts in *P.W.P.* are analogous to the facts in *Davidson* because both cases contain bright line events. Unfortunately, the present case does not involve a bright line event, therefore, *P.W.P.* and *Davidson* are factually distinguishable and, in our estimation, legally distinguishable.

Finally, we note *Lujan v. Mansmann*, 956 F. Supp. 1218 (E.D. Pa. 1997), because the factual underpinnings of that case are strikingly similar to those in this appeal and there is a good discussion regarding what is called the "discovery rule" under a statute of limitations analysis.

In 1990, Lujan sought treatment from the defendant psychologist for emotional problems, including bulimia. During treatment, the psychologist persuaded Lujan to believe: (1) she had been a victim of satanic cult abuse; (2) was being stalked by a cult; (3) she needed to sever ties with her family and friends, except when requesting money; and (4) she needed plastic surgery to alter her features so she could escape the cult. In July 1992, the defendants advised Lujan they were discontinuing her therapy for 2 years "until the danger from the cult subsided." 956 F. Supp. at 1222.

Lujan's parents had paid for her therapy and brought suit in 1994, alleging the treatment given to their daughter was negligent. See *Tuman v. Genesis Associates*, 935 F. Supp. 1375 (E.D. Pa.

1996). Lujan found out about her parents' lawsuit in December 1995. "As a result of this information, Lujan discovered the techniques and unethical practices employed by Defendants, and for the first time, understood that Defendants' mind control techniques had harmed her." 956 F. Supp. 1222.

In denying the defendants' motion to dismiss Lujan's amended petition because the applicable statute of limitations had run, the court noted application of the discovery rule depends largely on the nature of the injury alleged. The court then made this telling observation:

"The dynamics of the psychiatrist-patient relationship contribute to this finding. Patients do not immediately assume their treating psychiatrists are perpetrating tortious acts through harmful and psychologically damaging treatment. Instead, patients are reluctant to either impute ulterior motives to the advice of the psychiatrist or automatically question the propriety of the psychiatrist's treatment." 956 F. Supp. at 1226.

The above reasoning expressed in *Lujan* is equally applicable in this case. Admittedly, Hall knew before terminating her counseling relationship with Miller that he had misdiagnosed her mental problems. However, prior to meeting with the individuals from the FMSF, Hall had no reason to believe Miller had *caused* her injury.

Under the circumstances of this case, we conclude that when the fact of injury became reasonably ascertainable cannot be determined as a matter of law but rather should be submitted to the trier of fact for determination. We hold the trial court erred in granting the defendant Miller summary judgment.

Reversed and remanded.