**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 30, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KRISTOPHER JOSEPH KOWALSKY;
MICHELLE ANN KOWALSKY,

       Plaintiffs - Appellants/
       Cross - Appellees,

v.

S & J OPERATING COMPANY,

       Defendant - Appellee/
       Cross - Appellant.

No. 12-3150 & 12-3152
(D.C. No. 6:10-CV-01222-SAC)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **MATHESON, McKAY,** and **EBEL,** Circuit Judges.

Kristopher and Michelle Kowalsky ("the Kowalskys"), a husband and wife, sued

S & J Operating Co. ("S & J "), alleging that S & J's use and deficient plugging of a

saltwater disposal well in the late 1980s damaged the Kowalskys' property. In 2005,

while renting the land from Mr. Kowalsky's mother, the Kowalskys noticed changes to

the property and asked the Kansas Corporation Commission (the "KCC") to evaluate the

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

land. The KCC found subsidence and told the Kowalskys it was unlikely to get worse.

But the subsidence worsened. The hole around the saltwater disposal well dropped eight

additional inches by late 2006, and subsided into the water table by 2008. Mr.

Kowalsky's mother deeded the land to the Kowalskys in 2007. They brought this action

against S & J in 2010.

S & J moved for summary judgment, which the district court granted, concluding

there was no factual dispute that the claim accrued before the Kowalskys owned the

property. Because tort claims in Kansas are not assignable, the court held the Kowalskys

do not have standing to sue. On appeal, the Kowalskys agree that tort claims are not

assignable, but assert their claim did not accrue until 2008, after they owned the property.

We affirm the district court's grant of summary judgment.

## I. BACKGROUND

### A. *Factual Background*[1]

In August 1944, a saltwater disposal well was drilled on the Kowalsky family

property, Kowalsky 8SWDW (the "Kowalsky property"), in Barton County, Kansas. In

April 1985, S & J purchased an oil and gas lease to the Kowalsky property, including the

disposal well.

Saltwater disposal wells are part of the oil production process. The porous rocks

---

[1] In reviewing the district court's grant of summary judgment, we recite the evidence in the light most favorable to Mr. and Mrs. Kowalsky, the nonmoving parties. *See Mountain Highlands, LLC v. Hendricks,* 616 F.3d 1167, 1169-70 (10th Cir. 2010).

that contain oil and gas reservoirs also contain saltwater. The saltwater, which is pumped out along with the gas and oil, is discarded using saltwater disposal wells. The saltwater is injected down the disposal well into other underground porous rock, bounded above and below by impermeable strata.

A salt formation lies underneath the Kowalsky property. If undersaturated saltwater brine or fresh water were injected into the disposal well and leak out into the salt formation, the water could dissolve the salt in the formation, causing underground caverns to form. If these caverns cave in, the land would subside or cause a sinkhole to develop on the surface. Apart from the Kowalsky property, there are eight sinkholes in Barton County, Kansas associated with saltwater disposal wells.

After using the saltwater disposal well for four years, S & J found in 1989 that the well failed a mechanical integrity test and sought approval from the KCC to plug the well to prevent or stop leakage. The KCC approved S & J's plan. S & J ran into problems plugging the well with cement and had to take extra measures using large amounts of gel and cottonseed hulls. One month after it attempted to plug the well, S & J sold its Kowalsky property lease to Davis Petroleum.

In the spring of 2005, Mr. Kowalsky, who was renting the Kowalsky property from his mother, noticed some subtle changes on the horizon of the land and spoke to his neighbor about it. Mr. Kowalsky could not pinpoint the changes, but it seemed to him that his wood pile in the pasture was lower. He thought there may have been some settling in the area around the well, 1,200 feet away from the Kowalsky home. The road

in front of his neighbor's house "was constantly wet and it had never been wet before, and there was a dip in the road that had never been there before." Appx. at 406. Mr. Kowalsky noticed small cracks in the house, which he described as larger than a hairline but smaller than a quarter-inch. Also, the sidewalk pads around the house changed in elevation by about a quarter-inch so they no longer matched up. Mr. Kowalsky testified in his deposition that he did not know whom to talk to, what was going on, or what to do about it.

The neighbor recommended that Mr. Kowalsky speak with Tim Dickinson, who had worked on the site for the cement company that contracted to plug the well. Mr. Dickinson told Mr. Kowalsky about the problems plugging the well and provided Mr. Kowalsky with a copy of the plugging report. Mr. Dickinson contacted the KCC to report a possible low spot or sink hole on the Kowalsky property. Mr. Kowalsky then started to notice a rapid change in elevation, noting that "it was getting pretty aggressive about that time." He stated that he was not really sure what was happening until he talked to Mr. Dickinson, but then he really started noticing changes to the land.

The KCC inspected the Kowalsky property on April 18 and 20, 2005. The KCC report states that Mr. Kowalsky spoke with the KCC agent and told him that he believed his irrigation water well had dropped 12 feet in the last three years and that his house and

other buildings were settling toward the hole.[2]  Mr. Kowalsky admitted to the KCC agent that he had not brought up the low spot earlier because he (1) did not know who was responsible, (2) wanted to remain on good terms with the current leaseholder, and (3) did not want to falsely accuse anyone.  He also told the KCC agent that the hole had fallen another foot in the day between the agent's visits (although the KCC agent did not notice a difference).  The KCC agent told Mr. Kowalsky that the subsidence was in the precise location of the plugged well.  The agent added there was nothing anybody could do about the subsidence, but it was probably as big as it was going to get.

In May 2005, the KCC installed a monitoring point at the site to track subsidence. In late 2006, the stake that the KCC had installed at the monitoring point had disappeared from view, was covered with water, and had sunk two-thirds of a foot since May 2005. The stake has remained under water ever since.

An aerial photograph taken on March 15, 2007, shows no standing water on the property.  The land slowly began holding rain water.  When asked when standing water first appeared, Mrs. Kowalsky stated that it began just after the Greensburg tornado, which occurred in May 2007.  "I realize that after the Greensburg tornado, that was the most significant water we had ever had in a long—in a seven-year span at least, and it's very evident after that. We've always had water after that." Appx. at 418.

_____

[2] Mr. Kowalsky testified in a deposition that he did not remember saying that the buildings were settling toward the hole, but did remember saying that it was hard for him to pinpoint just what was happening.

Mr. Kowalsky's mother deeded the land to Mr. and Mrs. Kowalsky in September 2007. In 2008, the land had sunk so much that it reached the water table. There was significant standing water on the land. An aerial photograph, with "2008" handwritten at the top, shows standing water around the hole. Two more aerial photographs taken in 2009 and 2010 showed the progression of the land subsiding into the water table as water covered increasingly more area.

The Kowalskys claim that, although the house and sidewalk had small cracks as early as 2005, no structural damage occurred to the house before 2008. Additionally, they claim the subsidence did not affect their use or enjoyment of the land, including pasturing their cows, until 2008. The water became so salty by then that it was toxic for the cattle. The Kowalskys were also unable to use the land for recreational purposes, such as building a motocross course, or for business purposes, such as building a new workshop, for fear of damage or injuries from the subsidence.

An undated KCC report attributes the subsidence to "a large amount of fresh or under saturated brine waters interacting with the salt section, and subsequently dissolving the formation." Appx. at 124. One of the Kowalskys' experts stated that S & J's ineffective plugging of the disposal well caused the subsidence even though the plugging complied with accepted practices. The Kowalskys' other expert also concluded the disposal well caused the subsidence but believed the subsidence resulted from the well's casing corroding, allowing disposed brine to seep outside the casing and into the salt formation.

## B. *Procedural History*

On January 29, 2010, the Kowalskys filed suit against S & J in Kansas state court seeking monetary damages for nuisance. They alleged that S & J's negligence in plugging the well created a nuisance that materially interfered with their property rights. On July 8, 2010, the case was removed to federal district court based on diversity jurisdiction. S & J moved for summary judgment, arguing that the statute of repose, which is 10 years for nuisance claims, barred the Kowalskys' claim. The Kowalskys asked the court to allow them to add a claim for trespass by subsidence. The court granted both S & J's motion for summary judgment on the nuisance claim and the Kowalskys' request to add the trespass claim.

After the Kowalskys added the trespass claim, S & J again moved for summary judgment, arguing that trespass by subsidence accrued when Mr. Kowalsky's mother owned the property and that the action was not assignable under Kansas law. S & J also argued that summary judgment was appropriate because trespass by subsidence is an intentional tort, and there was no evidence that S & J engaged in intentional or purposeful conduct that caused the removal of surface support.

The district court granted S & J's motion for summary judgment on the grounds that the action had accrued before the Kowalskys owned the property and the action was not assignable. The court did not reach the intent argument. The Kowalskys timely filed this appeal. S & J cross-appealed, arguing that the district court should have granted summary judgment on the intent issue as well.

## II. **DISCUSSION**

The Kowalskys argue on appeal that the district court erred in granting S & J's summary judgment motion by deciding disputed questions of material fact about when the trespass by subsidence claim accrued. The Kowalskys concede that the claim is not assignable but argue the claim accrued when they owned the property and less than two years before they sued, and assignability thus would not come into play. If the claim accrued before the Kowalskys took ownership of the property in September 2007, it could not be assigned to them and the suit otherwise would be barred by the two-year statute of limitations.

When the claim accrued is dispositive. We conclude that the Kowalskys' claim accrued before they acquired the property in September 2007. The district court correctly held the claim was not assignable to them. The two-year statute of limitations also bars their claim.[3]

### A. *Standard of Review*

"We review the district court's grant of summary judgment de novo, applying the

---

[3] We may affirm on alternative grounds if "there is a record sufficient to permit conclusions of law." *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994). Defendants must plead an affirmative defense based on the statute of limitations. K.S.A. 60-208(c). Although S & J does not argue on appeal that the statute of limitations bars this suit, it did so in its first answer. "Summary judgment may be proper on the affirmative defense of the statute of limitations where there is no dispute or genuine issue as to the time when the statute commenced to run." *Olson v. State Highway Comm'n of Kan.*, 679 P.2d 167, 174 (Kan. 1984) (quoting *Hecht v. First Nat'l Bank & Trust Co.*, 490 P.2d 649, 656 (Kan. 1971)).

same standards that the district court should have applied." *Jensen v. Solvay Chemicals, Inc.,* 625 F.3d 641, 650 (10th Cir. 2010). We view the evidence in the light most favorable to the Kowalskys, the non-moving parties. *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1171 (10th Cir. 2013). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A genuine dispute of material fact exists if the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* As this is a diversity action from Kansas, the governing substantive law is Kansas law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Cohen-Esrey Real Estate Servs., Inc. v. Twin City Fire Ins. Co.*, 636 F.3d 1300, 1302 (10th Cir. 2011).

When an actionable injury is reasonably ascertainable and a claim thereby accrues is a factual issue. *See Admire Bank & Trust v. City of Emporia*, 829 P.2d 578, 582 (Kan. 1992). If factual issues are in dispute, they are within the purview of the factfinder and should not be decided on summary judgment. *See Olson v. State Highway Comm'n of Kan.*, 679 P.2d 167, 174 (Kan. 1984).

### B. *Applicable Law*

1. **Trespass by Subsidence**

To show trespass by subsidence, a landowner plaintiff must show (1) the

defendant committed an act that (2) resulted in an intrusion upon the surface of the land, (3) which interfered with the surface owner's right to exclusive possession and enjoyment of the land. *See Nida v. Am. Rock Crusher Co.*, 855 P.2d 81, 86-87 (Kan. 1993).

The act occurs when the offending party removes land support (lateral or subjacent) so that "the earth is so much disturbed that it slides or falls." *Kan. City N.W.R. Co. v. Schwake*, 78 P. 431, 433 (Kan. 1904); *see also Nida*, 855 P.2d at 83. The intrusion on the land's surface is allowing the surface to fall. *Nida*, 855 P.2d at 84 ("[T]he actionable wrong is not the excavation, but the act of allowing the other's land to fall." (quotations omitted)). The interference with rights is the subsidence and associated damage. *Id.* ("In a trespass action, the intrusion and the interference and the occurrence of damage are concurrent.").

Although the act of removing the land support may have happened long ago, the trespass does not occur until the land actually subsides. *See id* at 87. ("[T]he subjacent support right entitles a surface owner to damages when injury to the surface actually occurs."); *Audo v. W. Coal & Mining Co.*, 162 P. 344, 347 (Kan. 1917) ("Until the land subsided the plaintiff sustained no damage and had no cause of action."); *Schwake*, 78 P. at 433 (same).

2. **Accrual of Trespass by Subsidence**

K.S.A. 60-513(b) provides that a trespass by subsidence claim accrues when the "act giving rise to the cause of action first causes substantial injury, or if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of

limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party." Once the claim has accrued, an action must be brought within two years. *Id.* at 60-513(a)(1).

Kansas cases interpreting and applying the accrual statute explain that an action accrues when "the plaintiff could first have filed . . . his action." *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc*., 936 P.2d 714, 719 (Kan. 1997). "[W]hen the facts of injury were reasonably ascertainable is an essential element in determining when a tort action accrued." *Gilger v. Lee Const., Inc*., 820 P.2d 390, 401 (Kan. 1991).

Because trespass by subsidence does not occur until the defendant has allowed the surface to fall and the surface has subsided, *see Nida*, 855 P.2d at 86-87, the action accrues when the subsidence is reasonably ascertainable. Although K.S.A. 60-513(b) refers to "substantial injury," Kansas courts have held that an injury is substantial when it is actionable. *Roe v. Diefendorf*, 689 P.2d 855, 859-60 (Kan. 1984).

Applying K.S.A. 60-513(b), *Nida*, and *Diefendorf* to this case, the question is whether there is any factual dispute as to accrual that would allow the Kowalskys to survive summary judgment. The answer depends on when subsidence was reasonably ascertainable.

### 3. **Assignability of Tort Claims**

"In Kansas, tort claims . . . are unassignable." *Morsey v. Chevron, USA, Inc.*, 94 F.3d 1470, 1478 (10th Cir.) (citing *Heinson v. Porter*, 772 P.2d 778, 783-85 (Kan. 1989), *overruled in part on other grounds by Glenn v. Fleming*, 799 P.2d 79 (Kan. 1990)). Tort

-11-

claims remain with the injured party as they are personal in nature and, for public policy

reasons, are not permitted to be bought and sold.  *See Heinson*, 772 P.2d at 785.

## *C. Analysis*

1. **Summary Judgment Was Appropriate**

We agree with the district court that the "evidence here is so one-sided" that there

was a reasonably ascertainable substantial injury well before the Kowalskys acquired the

property in September 2007.  *Kowalsky v. S & J Operating Co.*, 10-CV-01222, Dkt. No.

59 at 12 (D. Kan. May 1, 2012) (hereinafter Dist. Ct. Op.).  We conclude that subsidence

was reasonably ascertainable starting in 2005 and at least by late 2006.  Summary

judgment for S & J was therefore appropriate based on non-assignability of the claim,

which was otherwise time-barred.

Trespass by subsidence accrued when the land was so disturbed that it fell.  *See*

*Nida*, 855 P.2d at 84.  In the spring of 2005, cracks appeared in the sidewalk and

foundation of the home, the pasture appeared to be lower, the neighbor's road was

constantly wet and had a new dip, and the KCC began to monitor subsidence around the

site of the saltwater disposal well.

Mr. Kowalsky admitted that in April 2005, "[i]t just seemed like the land was

shifting.  It seemed like the land was starting to drop."  Appx. at 406.  He also stated that

the change in elevation "was getting pretty aggressive about that time."  *Id.*  By late 2006,

the stake that the KCC had put in the ground to monitor subsidence had sunk an

additional eight inches and was covered by water.  There is no dispute that the Kowalskys

knew that subsidence had occurred.

The record also shows that the Kowalskys should have ascertained that the saltwater well caused the subsidence. In 2005, Mr. Kowalsky's neighbor suggested talking to Mr. Dickinson because the subsidence was occurring where the disposal well was located and Mr. Dickinson had worked on the team that had problems plugging the well. Mr. Dickinson gave Mr. Kowalsky the plugging report, which detailed the problems in plugging the well. The KCC agent mentioned there were problems plugging the well and also connected the subsidence to the well. Mr. Kowalsky even admitted that in 2005 he linked the saltwater disposal well and the subsidence and stated that he would have said something sooner but did not want to upset the current leaseholder. The KCC set up its first monitoring point at the well site, which was underwater in late 2006. The proof of subsidence linked to the well was undeniable and certainly reasonably ascertainable.

This case is similar to *Friends University v. W.R. Grace & Co.,* in which Friends University sued the manufacturer of material used in a library roof. 608 P.2d 936, 938 (Kan. 1980). The college built the roof in 1969, and in 1970 it started to leak during each rainfall. *Id.* In 1975, the college hired a roof expert, who determined that a defect in the roofing material caused the leaking. *Id.* at 939. The Kansas Supreme Court determined that the plaintiff's failure to know the exact cause of the leaking did not toll accrual of the two-year statute of limitations when a problem was apparent by at least 1972. *Id.* at 940, 942. The same holds true here. The Kowalskys' self-admitted failure to know the exact

-13-

cause of the subsidence did not toll accrual in the face of on the property.

The court in *Friends* also stated that "[a]t any time Friends could easily have obtained an expert opinion on the precise cause or causes for the leaking roof," and thereby determine the culpable parties. *See id.* at 942. "Inherent in 'to ascertain' is 'to investigate.'" *Davidson v. Denning*, 914 P.2d 936, 946 (Kan. 1996). Here, the Kowalskys did obtain an expert opinion by asking the KCC to investigate the property. The KCC pointed to the saltwater disposal well as the cause of the subsidence and noted S & J's troubles in plugging the well.

In short, the Kowalskys were aware in 2005 of subsidence, which became even more apparent in 2006. Not only was the subsidence's cause reasonably ascertainable by then, the Kowalskys did ascertain, with the KCC's assistance, that the saltwater disposal well caused the subsidence. The trespass by subsidence claim therefore accrued before the Kowalskys acquired the property in September 2007.

The Kowalskys do not dispute that, if the claim accrued before they owned the property, their claim is barred by non-assignability. Summary judgment was appropriate because the claim could not be assigned to them and because the statute of limitations had run before they brought this suit in 2010.

2. **Kowalskys' Arguments**

The Kowalskys make two arguments: (1) the subsidence cases show that the "substantial injury" standard requires serious damage to the surface or a diminution of

use or value, which did not occur here until 2008;[4] and (2) they could not have reasonably ascertained the injury before 2008 because saltwater wells and subsidence are complicated.

### a. Substantial Injury

The Kowalskys argue if a hairline crack, *see Olson*, 679 P.2d at 173, or small sinkholes, *see Ward v. Island Creek Coal Co.*, 1995 WL 371676 at *2 (4th Cir. 1995) (unpublished), are not substantial, actionable injuries, there was no substantial injury here before 2008 because only small cracks appeared and the subsiding land had not yet reached the water table. We disagree.

First, the Kowalskys' argument overlooks the record, including Mr. Kowalsky's deposition, showing their awareness of sidewalk and home foundation cracks, lower pasture, wetness and new dips in the neighbor's road, sinkage of the KCC monitor stake, and the connection of all this to the saltwater disposal well. This is sufficient for accrual under K.S.A. 60-513(b) and *Diefendorf*, which holds that the seriousness of the injury

---

[4] The Kowalskys argue that the district court applied the wrong legal standard to determine when the action accrued: instead of looking at when the surface had *appreciably* subsided, they argue district court should have been looking at when the surface had *substantially* subsided as to create a reasonably ascertainable injury.

The court, however, used the word "appreciably" to refer to the subsidence while still recognizing the injury must be substantial under K.S.A. 60-513(b). "There is no genuine factual dispute remaining that before the plaintiffs ever acquired this land, its surface had fallen or subsided *appreciably* as to result in a *substantial* injury. . . ." Dist. Ct. Op. at 13 (emphasis added).

does not govern when the action accrues. 689 P.2d at 859.[5]

Second, the Kowalskys' cases are distinguishable. In *Olson*, a homeowner sued a contractor and the Kansas Department of Transportation for foundational damage from blasting while building a highway near her home. 679 P.2d at 170. The homeowner's son discovered a hairline crack in the foundation and told the highway work crew about it in May or June of 1978, thinking the crew would return after blasting was completed to assess any damages to the home. *Id.* The plaintiff moved into the home without inspection in 1979, but in 1980 discovered many significant foundation cracks. *Id.* The plaintiff filed suit in October 1980, more than two years after the first hairline crack was discovered. *Id.* On appeal, the Kansas Supreme Court held that the statute of limitations issue should be submitted to a jury. *Id.* at 173-74.

The Kowalskys argue *Olson* holds that a hairline crack is not a sufficient injury for claim accrual. But the *Olson* court did not say the hairline crack was not insufficient. It denied summary judgment because a jury could conclude that subsequent blasting within the statute of limitations period caused additional, substantial cracking. *Id.* at 173. The Kowalskys' reliance on *Olson* is also misplaced because much more than hairline crack

---

[5] At oral argument, the Kowalskys' attorney acknowledged that the Kowalskys would have had a claim for trespass by subsidence before 2008 for the damages that existed at that time. He also said this damage affected the value of the property "in a minor way." Oral Argument Recording at 12:40.

damage was apparent on the Kowalsky property in 2005 and 2006.[6]

In *Ward*, an unpublished Fourth Circuit case interpreting Virginia law, coal mining initially caused several sinkholes on the plaintiff's property. 1995 WL 371676 at *1. The property progressed into subsidence, causing major structural damage to buildings and a well. *Id.* The Fourth Circuit said that *even if* the sinkholes were not a substantial injury, the plaintiff still could not recover under the later, larger injury because the statute of limitations had expired. *Id.* at *2. The court did not say whether the sinkholes constituted substantial injury. *Ward* provides no support for the Kowalskys.

### b. Lacked Knowledge

The Kowalskys contend that they did not know the disposal well caused the subsidence until 2008 because they lacked knowledge about subsidence. But the test is reasonable ascertainment, an objective test that established accrual here as explained earlier.

The Kowalskys rely on *Hecht v. First National Bank & Trust Co.*, a medical malpractice case in which x-ray treatments for Hodgkin's disease burned a patient. 490 P.2d 649, 651-54 (Kan. 1971). Despite the doctors' assurances that the burn would eventually heal itself, the patient developed an ulcer that required extensive surgery. *Id.* at 654. She filed suit months after the surgery and years after the initial burn. The

---

[6] By Mr. Kowalsky's admission, in 2005 the cracks in his foundation were "larger than a hairline" but "not as big as quarter-inch." Appx. at 406.

Kansas Supreme Court held that, although the patient knew she had an unhealed sore more than two years before filing suit (outside the statute of limitations), her knowledge of her condition at that time was not "sufficient to justify a determination . . . that she knew or could have reasonably ascertained . . . that she had suffered substantial injury caused by the alleged negligent treatment of the defendants." *Id.* at 655.

The Kowalskys liken the KCC's telling Mr. Kowalsky the subsidence was unlikely to get worse to the doctors' telling Ms. Hecht her burn would heal on its own. They also analogize the changes they noticed to the land before 2008 to the patient's burn two years before filing the suit —an injury was apparent, but it was not a substantial injury that they could reasonably have ascertained was caused by the disposal well or S & J.

The Kowalskys' reliance on this case is unavailing. First, the Kansas Supreme Court has limited the holding in *Hecht*. *See, e.g.*, *Diefendorf*, 689 P.2d at 859; *Friends Univ.,* 608 P.2d at 940. In *Diefendorf*, the court stated that the *Hecht* facts are distinctive because "[r]adiation therapy, whether or not properly done, frequently produces substantial injury to the body, which generally heals in time. . . . Further, with a living entity, healing can occur which remedies the problem in whole or in part." 689 P.2d at 859 (quoting *Friends Univ.,* 608 P.2d at 940).

Second, *Hecht* is distinguishable. The KCC's telling the Kowalskys that the subsidence was unlikely to get worse is not equivalent to doctors telling a patient that an injury will get better. Also, the KCC's comment that the subsidence was unlikely to get

-18-

worse does not erase that there was subsidence or the Kowalskys' awareness of it when the KCC came to inspect the land in 2005. The Kowalskys knew the injury was sufficient for the KCC to monitor the site, and Mr. Kowalsky stated the subsidence was "getting pretty aggressive" in 2005. Appx. at 406. They did not need knowledge of the extent of the injury to reasonably ascertain its existence. *Friends Univ.,* 608 P.2d at 940.

## III. **CONCLUSION**

For the foregoing reasons, we affirm the district court's decision to grant summary judgment for S & J in the direct appeal, 12-3150. As a result, we dismiss S & J's cross-appeal, 12-3252.[7]

ENTERED FOR THE COURT

Scott M. Matheson, Jr.
Circuit Judge

---

[7] S & J's cross-appeal should instead have been presented as an alternative basis to affirm, *see United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951, 958 (10th Cir. 2011); *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1198 (10th Cir. 2010).